# ELDRIDGE G. RIGGS v. METROPOLITAN STREET · RAILWAY COMPANY, Appellant.

## Division One, January 14, 1909.

1. **NEGLIGENCE: Ordinance Regulation: Issue Eliminated.** Where a violation of a street car fender ordinance is one of the specifications of negligence pleaded, but the cause was not put to the jury on that issue, that phase of the case is thereby eliminated.

2. **DEMURRER TO PLAINTIFF'S CASE.** Where defendant offered a demurrer to plaintiff's evidence, but did not stand upon it when it was overruled, but went on and put in its own evidence, that demurrer is afield, and the case must be viewed as a whole.

3. **NEGLIGENCE: Bridge in Street: Anticipating Persons on Track: Duty to Look.** Where a bridge, in the center reserved for railway tracks, on each side of them a driveway for wagons, and next to the driveways a sidewalk for pedestrians, is to all intents and purposes a continuation of a public street, it was the duty of defendant, although at the end of the bridge across the central part two-by-four slats projecting slightly above the surface were nailed to the floor to prevent wagons from passing on the track, to anticipate the presence of pedestrians on the track at one o'clock at night and to keep a lookout for them. Those slats filled no office of warning to pedestrians of exclusive railroad use. Besides, the primary user in a public street is in the public at large, and both pedestrian and railway company having a mutual and correlative right to use the street, or the bridge which is a continuation of the street, their relative rights and duties are regulated by the exercise of due care, and due care on the part of a railway company requires it to keep a lookout ahead to prevent injury to a footman.

4. ———: ———: ———: ———: **Theory at Trial.** Where both parties tried the case on the theory that it was defendant railway company's duty to keep a lookout for the presence of plaintiff footman on the track at the point of the accident, defendant will not be heard on appeal to contend that, under the circumstances, it owed plaintiff no such duty. Common error is not reversible error.

5. ———: ———: ———: ———: **Nighttime.** The fact that the time of the accident was after midnight did not relieve the railway company of its duty to look ahead for a man on the track, in running its street car. Due care is care according to time and circumstance, and the gauge of duty and due care

rises precisely as the degree of danger rises. A degree of darkness, whether from the absence of sunlight, or from the presence of shadows cast by columns on a bridge, or from the fact that the curve in the street throws the rays of the car's headlight away from the *locus*, may create an inability to see well, but does not relieve the motorman from his duty to look; if anything, it increases it.

6. ————: **Experimental Tests: Reproduction of Situation.** Experiments and their results are admissible in evidence when it is first shown that causal conditions and circumstances are substantially reproduced at the experiments. But where a reproduction depends for its facts upon a plaintiff who at the time of the accident and for a time prior thereto was unconcious, it cannot be said to be a reliable reproduction of the situation. So that where plaintiff testifies that he was struck by a west-bound street car, was knocked onto the east-bound track and rendered unconscious and remained in that condition until his leg lying over the rail was crushed by an east-bound car, photographs made in an experiment to reproduce the situation one year later, showing him to be situated four feet away from the column of the bridge in whose shadow he was found after the accident, are not admissible, if his location at the time of the accident is made to depend on his testimony alone.

7. ————: ————: ————: **Situation of Injured Party.** And where all the evidence shows that the injured plaintiff was lying down at the time of the accident, experiment photographs of a man sitting upright at the same place are not admissible.

8. ————: ————: ————: ————: **Stopping Cars.** And photographs showing human figures sitting upright close to the rail and at a place where headlights from cars forty feet distant fell upon them in time for the motormen to stop the cars, whereas the motorman whose car injured plaintiff saw, when his car was six or eight feet away, in the shadow of the bridge column the dim outlines of what turned out to be an unconscious man apparently lying down, do not reproduce the situation; and inferences drawn from them, and the results of experiments made in connection with them, namely, that plaintiff was not in the shadow of the bridge column, that the headlight fell upon him when the car was forty feet away, and that the car could have been stopped with due care in time to avoid hitting him, are not reasonable inferences, and do not tend to prove defendant's negligence.

9. ————: **Man on Track: Humanitarian Doctrine.** Where by plaintiff's own evidence he was unconscious at the time of the accident and had been for a time prior thereto, and for that reason could not fix the point of his location on the track where

the car struck him, and the only other eye-witness, the motor-man, testifies that he did not see plaintiff until he was within six or eight feet of him, that he was then lying in the shadow of the bridge column where the headlight from his car did not fall upon him, and that he was looking and did not and could not sooner see him, and that he stopped the car in the shortest time and space possible after discovering him, a peremptory instruction to, find for defendant should be given.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback*, Judge.

REVERSED.

*John H. Lucas, Frank G. Johnson* and *Halbert H. McCluer* for appellant.

(1) The court erred in refusing defendant's instruction in the nature of a demurrer to the evidence requested at the close of plaintiff's case and renewed at the conclusion of all the evidence. Zimmerman v. Railroad, 71 Mo. 477; Sweeny v. Railroad, 10 Allen 372; Carr v. Railroad, 195 Mo. 225; Feeback v. Railroad, 167 Mo. 215; Eppstein v. Railroad, 197 Mo. 733; Williams v. Railroad, 96 Mo. 282; Barker v. Railroad, 98 Mo. 53; Rine v. Railroad, 88 Mo. 399; Carrier v. Railroad, 175 Mo. 470; Frye v. Railroad, 200 Mo. 405; State ex rel. v. Bank, 120 Mo. 169; State ex rel. v. Williams, 99 Mo. 302; Mathias v. O'Neil, 94 Mo. 528; Lenox v. Harrison, 88 Mo. 491. (2) The court erred in admitting the testimony in relation to experiments on the stopping of cars and the distance within which a party in the position plaintiff claims himself to have been could have been seen. Goble v. Kansas City, 148 Mo. 475; Doud v. Reid, 53 Mo. App. 559; Rose v. Bank, 91 Mo. 402; Columbus Construction Co. v. Crane Co., 98 Fed. 957.

*Henry Latshaw* and *Ralph S. Latshaw* for respondent.

(1) Appellant says respondent was a trespasser. This is a new and novel theory in this case, a theory advanced now for the first time—a theory advanced in this court contrary to the theory upon which respondent tried this case in the circuit court. See appellant's instructions, especially its instruction No. 5. It has long been the law of this State that appellant must stand or fall by the theory or postion assumed by it upon the trial. Merriclees v. Railroad, 163 Mo. 486; Campbell v. Railroad, 175 Mo. 161; Chinn v. Naylor, 182 Mo. 595; Meyer B. D. Co. v. Bybee, 179 Mo. 354; Kennefick v. Ins. Co., 103 S. W. 957; Glaser v. Rothschild, 106 Mo. App. 418; Sock v. Co., 112 Mo. App. 476; Mitchell v. Co., 122 Mo. App. 50; Fuess v. Kansas City, 191 Mo. 692; Bragg v. Railroad, 192 Mo. 331. (2) But respondent was in no sense a trespasser. The bridge where he was run over was a public street, Bluff street, in Kansas City; it was one of the populous thoroughfares in Kansas City; it was the only street for vehicles and pedestrians to use going to and from the Union Station. Appellant has much to say about the bridge being divided into separate rights of way for vehicles, cars and pedestrians. The fact is it was divided exactly like all streets in Kansas City, the street railway tracks in the center, wagon roadways on each side thereof, and sidewalks on the outside of the roadways; there is no significance in such division of a public street, it is the usual division. But where is the evidence in this record of any right, title or special interest of appellant in this bridge? Where is the evidence that appellant has or had any right or power to declare the public trespassers for being on this bridge, or any part thereof? There is no such evidence—not one word. Where plaintiff is a trespasser and defendant

had reason to believe people were liable to be, appellant owes said trespassers exactly the duty which appellant (and respondent too) stated in their instructions to the jury, viz., it must exercise ordinary care to discover the presence of plaintiff. Everett v. Railroad, 112 S. W. 486; Scullin v. Railroad, 184 Mo. 695; Eppstein v. Railroad, 197 Mo. 720; Frye v. Railroad, 200 Mo. 377; Hoegill v. Co., 181 Mo. 379; Fearsons v. Railroad, 180 Mo. 208; Burde v. Co., 123 Mo. App. 629; Siles v. Knott, 197 Mo. 684. (3) A demurrer to the evidence should not have been sustained. When the car ran over plaintiff it shoved or dragged him four or five feet (both plaintiff and defendant swear to this), and after having thus shoved or dragged him, plaintiff then lay about three feet on the bridge and also he then lay in the shadow of the bridge column. In other words, when he was first struck by the car that ran over him he was lying off of the bridge and in the full glare of the arc light. Appellant's motorman stopped his car within ten or eleven feet. But said motorman did not see plaintiff until after the front end of his car had passed plaintiff—the headlight had passed plaintiff—the fender was above plaintiff—so that if witness then dropped the fender it would drop on top of plaintiff. The motorman looking out of the side window of his vestibule and looking over his right shoulder saw plaintiff lying at the side of his car. These facts are all sworn to by appellant and undisputed by respondent. They are admitted facts. (4) The experiments were made one year from the date of plaintiff's injury. They were made at the exact place where plaintiff had been run over. The tracks, the bridge, the street and all the surrounding locality were the same then as on said date of the accident. The cars were the same, and the number of passengers therein were in no instance a less number than upon the car that ran over plaintiff. The headlights were all the same kind and the same size

as upon the car that ran over plaintiff. The lights both natural and artificial were the same, and the nights the same kind of nights as the night of the injury. The cars were all traveling at about the same rate as the car that ran over plaintiff. All the conditions surrounding the experiments were exactly like those surrounding the accident. The value of an experiment depends upon reproducing actual conditions identical with the case in question, but identical need not be carried so far as to cover conditions not causal as to the result. 12 Am. and Eng. Ency. Law (2 Ed.), 408; Cox v. Railroad, 126 N. C. 106; State v. Graham, 74 N. C. 646; Gilbert v. Co., 54 N. Y. Super. Ct. 274; Hayes v. Co., 17 Utah 99; Railroad v. Champion, 9 Ind. App. 510; County v. Stofen, 125 Cal. 38; Fein v. Co., 60 Ill. App. 278. If conditions are substantially the same, the result of the experiments would ordinarily be proper. People v. Phelan, 123 Cal. 551; Beckett v. Assn., 67 Minn. 298; Witcher v. Railroad, 70 N. H. 248; Byers v. Co., 94 Tenn. 345; Columbus C. Co. v. Crane Co., 98 Fed. 946; Brook v. Railroad, 81 Iowa 504; Burg v. Railroad, 90 Iowa 106; Railroad v. Reese, 70 Ill. App. 466; Railroad v. Logue, 47 Ill. App. 292; Nosler v. Railroad, 73 Iowa 268; Railroad v. Legg, 32 Ill. App. 218; Wilson v. State (Tex. Crim. App.), 36 S. W. 587; Railroad v. Mugg, 132 Ind. 168.

LAMM, P. J.—Defendant appeals from a judgment of the Jackson Circuit Court for $6,000 damages in favor of plaintiff for personal injuries, whereby his left leg and foot were so mashed and mangled that amputation between the knee and ankle followed as a sequence.

The petition counts on the negligence of defendant's servants in running one of its cars in Kansas City, in that (to quote) "said servants in charge of said car saw plaintiff upon said track and his perilous position upon said track, or by the exercise of ordi-

nary care and caution could have seen plaintiff on said track, and in his perilous position on said track, in reasonable time to have stopped said car before injuring plaintiff as above set forth, but said servants of defendant carelessly and negligently failed to do so.''

There was yet another specification of negligence, viz.: the violation of a fender ordinance in force in Kansas City, but the case was not put to the jury on that issue—whether from indisposition or lack of evidence is immaterial. Either view eleminates that phase of the case on review.

The answer, besides raising the general issue, averred plaintiff's contributory negligence.

The trial was long, the witnesses many, the evidence voluminous. Fortunately, the assignments of error do not call for the details of testimony witness by witness. Its tendency pro and con will do on some assignments; and where the point up seeks a closer and fuller statement of facts they will be stated in connection with the determination of the point itself.

Defendant assign error in overruling demurrers, in giving instructions and in ruling on the admission of evidence.

## I.   Of the demurrers.

(a)   Counsel argue that it was error to overrule a demurrer to plaintiff's evidence. But while offering such demurrer, defendant did not stand on it. It went on and put in its own proof. With the whole case in, the demurrer to plaintiff's part of it fills no sensible office in procedure. On appeal the case must be viewed as a whole; and whether plaintiff make a case in law to go to the jury is to be ruled, not only on view of his evidence in chief, but as well on view of defendant's and plaintiff's in rebuttal. Hence, this demurrer is afield.

(b)　But defendant at the close of all the evidence asked and was refused a peremptory instruction in its favor.　This challenge in the nature of a demurrer, *nisi*, is kept alive and pressed with vigor here. Attending to it, it will be seen that the specification of negligence charged in the petition proceeds solely on the humanitarian doctrine.　The charge is that defendant's servants running the car saw or might have seen plaintiff in peril in time to have prevented his injury, and negligently failed to prevent it.　In a nutshell, the theory of defendant on this assignment is that at the time and place of plaintiff's injury the facts raised no duty to keep a lookout for him, *ergo,* there was no actionable breach of such duty.　It insists that the full measure of its duty was not to negligently injure him after its motorman actually saw him in peril; moreover, that the proof fails to show the motorman was negligent in stopping the car after he discovered plaintiff's peril, hence (counsel argue) it must be ruled as a matter of law that plaintiff was not entitled to go to the jury at all.

Without burdening the case by producing the testimony on the issue as to whether plaintiff's peril was discovered in time to have stopped the car with the appliances at hand and with safety to its passengers and those manning it, it is sufficient to say there is no evidence tending to show that the motorman failed to stop the car as soon as possible *after* his actual discovery of plaintiff's peril.　It is all the other way. The only eye-witness was the motorman himself.　As presently seen, plaintiff's left leg lay across the defendant's track, he, plaintiff, knowing nothing of that fact.　His testimony sheds no light on the distance the car was away at the time the motorman saw the leg in that plight.　There were no by-standers or onlookers.　There were five or six passengers in the car but neither they nor the conductor saw plaintiff in peril before he was hurt.　The testimony of the motor-

man is to the effect that he was keeping an outlook ahead and when he first discovered plaintiff's danger he at once used all diligence in reversing his power and stopped the car within a few feet, but not in time to save the exposed leg. With the case in this fix, plaintiff was not entitled to go to the jury on the pleadings and evidence unless two things are true, *viz*: (1) unless defendant's motorman owed a duty to keep an outlook ahead and see plaintiff's peril if possible, and (2) unless he was able by due care to discover his danger in time to stop the car before injuring him.

(1) The first question for our determination, then, is: Did the motorman, time and place considered, owe a duty to plaintiff to lookout for him? This question seeks vital facts. Attending to them, the record shows that at the time of the accident the city was as near fast asleep as a city gets. It was the rise of an hour after midnight cock-crowing. All street cars except owl cars had ceased to run. The place was the Bluff Street bridge, close to the Union Depot in Kansas City. There Union and St. Louis avenues join and come into Bluff street over the bridge. From said depot to the heart of the city an elevated railroad runs. Pedestrians (not taking the elevated railroad) and teams, wagons and vehicles passing from the city proper to the depot and from it to the city proper use the most direct route, to-wit, the Bluff Street bridge— Bluff street as well as Union and St. Louis avenues being paved public streets of the city. The bridge is an iron structure about one hundred and twenty feet long from east to west and sixty-five feet wide from north to south divided into sections. It does not stand true with the cardinal points of the compass but, for the purposes of the case, its width may be taken as from north to south and its length as from east to west. Defendant has double tracks laid on Bluff street and across the bridge—one for east-going and the other for west-going cars. Its tracks (from the west) ap-

proach the bridge on an upgrade of three or four per cent and they are laid in the central section of the bridge. North of its tracks is a section of the bridge devoted to driveways for teams, wagons, etc. South of the tracks is a section similarly used. South and north of these traveled ways are two other sections devoted to foot-travelers. Cars do not stop to take on or let off passengers on or close to the bridge. On said central section at its west end, slats are nailed diagonally across the tracks. These slats are two-by-fours projecting above the surface and are cut so that the rails may pass through. They are intended to fill a similar office to a cattle-guard at a railroad crossing, *i. e.,* to prevent teams and wagons from passing on the tracks. The railroad section of the bridge is fenced off from the roadways on either side by iron posts and railings. The accident was at the west end of the bridge, and an idea of the *locus* may be got from tw photographic exhibits (No. 1 and No. 2) put in evidence, which we here reproduce. The letter ''R'' by the foot of the right-hand column of exhibit No. 1 is the spot (or near the spot) plaintiff puts himself as lying when struck by an owl car going east.

EXHIBIT No. 1.

EXHIBIT No. 2.

The arrangement of the bridge passageways is not inaptly likened by plaintiff's counsel to that usual in city streets, *viz*: a center for car tracks; on either side of them, a driveway where teams and wagons may freely come and go; and, at the verges of the street, paved sidewalks for footmen.    The only difference seems to be the iron columns and rails fencing off the car tracks from other sections of the bridge and the slats nailed across the entrance to the car section.

There is nothing in the record to show whether the city or defendant company built this bridge nor to show how defendant acquired the right to use it. Absent a record showing, the presumption would be that the bridge is a part of the public street and that defendant's user is based on its franchise right to use the street itself.

On such record briefly outlined, it is argued that the slats, iron columns and railings show the railroad section of the bridge to be a place where, time considered (to-wit, the dead hour of the night), defendant, entitled to a clear track, had no reason to anticipate the presence of persons and therefore lay under no duty to look for them.    But we take that argument as unsound, because:

In the first place the bridge, being to all intents and purposes a continuation of the street, the primary user in it, as in the street, is in the public at large. Street railways hold easements in public streets somewhat subservient to the public user.  [Deschner v. Railroad, 200 Mo. 1. c. 329, *et seq.*]  In that case it was held, in effect, that a vigilant watch ordinance was within the scope of a common law duty.  It was there said: "To hold that a motorman, driving a killing machine on iron rails in the people's highway, should keep a vigilant watch for everyone moving towards the track, especially children, is as much as (and no more than) to say that humanity and common sense dictate such

course; and to hold such to be a duty, even in the absence of an ordinance, would not strain, let alone break, the common law applicable to crowded cities and the use of a highway, common not only to street railways under their easement but, primarily, to all travelers. Indeed, if an elder equity is held to be a better equity, why may not an elder, a primary and a necessary use (a use that is the prime condition precedent—the *raison d'etre*—to any street) be held to be somewhat superior to a subsequent one created by easement and carved out of the common people's common inheritance, to-wit, their right to safely come and go on a public thoroughfare? Showing the pre-existing, dominant idea of public use, it has been held that a city council has no authority to establish a street for the use of a business corporation or an individual, but that the right to establish a street is traced back to the need of the public at large. [*In re* Twenty-first Street (Kansas City v. Hyde), 196 Mo. 498; see, also, Scullin v. Railroad, 184 Mo. l. c. 704, *et seq.,* and cases cited].''

We do not mean to say that under its police power, or as a trustee holding title to its streets for the benefit of the public, a city may not temporarily withdraw a portion of a street from public use by railings, danger lights and danger notices, or might not on due steps vacate a part of a street. We do not mean to rule that the slats on this bridge did not fence off its railroad section from use by teams, wagons, carts, drays, etc. What we say is those slats filled no office of warning to pedestrians of exclusive railroad use. They were of no more significance to footmen than were the rails of defendant's tracks. All sections of this bridge were floored and these slats may have tended to show that cars ran there, but the rails of the tracks did that and more effectually. Nor do we mean to rule that, in a certain sense, the rights of the general public are not

subordinate to the rights of the street railway in the portion of the street on which the tracks were laid. Therefore, there is nothing in our ruling contrary to what was said in Zimmerman v. Railroad, 71 Mo. l. c. 489, on which stress is put by counsel. What this court there said was, in effect, that the citizen had no right to quietly pursue his stroll on the tracks of a railroad laid in the public streets, that he was under an obligation to get out of the way of a passing train, and that the railroad company was not obliged to run its cars to suit the mere convenience of pedestrians, who for pleasure or otherwise strolled along its tracks. We agree to that doctrine now, when interpreted by the facts in judgment in the Zimmerman case.

But the question here is deeper and different. It is, Did the Railroad Company owe a duty to lookout for pedestrains on its track laid in a public street, including in that term the bridge? There ought to be but one answer to that question in law or in ethics, and this court holds a single and no uncertain voice in answering it in the affirmative. [Scullin v. Railroad, 184 Mo. l. c. 704, and cases cited; Beier v. Railroad, 197 Mo. 215; Schafstette v. Railroad, 175 Mo. 142; Oates v. Railroad, 168 Mo. l. c. 544.]

The sum of the right doctrine being that both a street railway company and the citizen on foot have a right to use the street, and neither having an exclusive right, it results that their relative rights and duties are regulated by the exercise of due care, and due care on the part of the street car company requires an outlook ahead to prevent injury to the citizen.

Again, in the second place, the case at bar is' relieved from all embarrassment on the point because the case was tried by both parties litigant on the theory, *nisi,* that defendant owed a duty to use due care to look ahead and see the danger to Riggs, if possible. "Hindsight" may be better than foresight, but "hindsight" is not allowable in the sober adminis-

tration of justice where to permit it involves a change
on appeal from the trial theory of a case. [Kenefick-
Hammond Co. v. Ins. Co., 205 Mo. 294.]

Inch by inch during the days of this drawn-out
trial, defendant contested its ability to see Riggs soon-
er than he was seen by the motorman, and did not con-
test his duty to see him as soon as possible by the exer-
cise of a care adjusting itself to the circumstances;
and, finally, without asking an instruction on any con-
trary theory, it persuaded the court to declare the
law to be as set forth in its instruction number 5,
*viz*:

"The court instructs the jury that if you find and
believe from the evidence that plaintiff was sitting or
lying in a position on or near the defendant's tracks,
and that a passing car ran upon or over him while in
such position, he cannot recover in this action against
defendant, unless you further find and believe from
the evidence that while plaintiff was in such position
defendant's motorman either saw him, or by the ex-
ercise of ordinary care could have seen him, in such
position in time, by the exercise of ordinary care, to
have stopped his car in time to have prevented said
car from running over plaintiff, and the burden is
on plaintiff to prove this to your reasonable satisfac-
tion by the greater weight of the credible evidence,
and if he has failed to do this your verdict must be for
the defendant."

The duty to look ahead is assumed in that instruc-
tion. Its theory was the theory of plaintiff's instruc-
tions. Hence if error at all, it was common error.
That common error is not reversible error is not to
be gainsaid.

Moreover, in the third place, we are unable to
agree with defendant's counsel in their insistence
that the hour of night was a factor tending to relieve
defendant from its duty to look ahead in running its
owl car. This, because due care is a care according

to time and circumstance. It adjusts itself automatically to the circumstances of a case. What is due care in one case might be negligence in another. While a degree of darkness, whether from the absence of sunlight, or from the presence of shadows cast by columns on the bridge, or from the fact that the curve in the street threw the rays of the headlight away from the *locus* (all of which elements are present here) may create an inability to see well, yet it does not tend to show an absence of duty *to look.* If anything, it increases that duty. The gauge of duty and due care rises precisely as the degree of danger rises.

The premises all considered, we hold that at the time and place the facts raised a duty to keep a lookout, and this is so whether Riggs lay on the bridge when first struck as contended by defendant, or off the bridge as contended by plaintiff.

The point is, therefore, ruled against defendant.

(2) The final question on the demurrer is: Is there any substantial evidence tending to show that defendant's motorman could have seen Riggs' danger in time to have stopped the car before his injury? This question seeks other facts, *viz*:

There are two broad theories running through the case. One, defendant's, is that plaintiff was drunk and in a drunken stupor lay down close to its track on the bridge and put his left leg over the rail. The other, plaintiff's, is that he was a stranger in Kansas City, stopping a few days in a distant part of the town with his brother; that, having in mind going to the Southwest for work as a carpenter or iron-molder, he left his brother's house and by easy stages stopped here and there, *viz*: to get a lunch, to visit saloons where he drank a glass of beer, and to visit a Salvation Army post. Midnight found him on Union avenue close to the depot and far from home. There he took a belated lunch and interviewed agencies holding forth in that region, whether to get work or to get

transportation to where work could be found is not quite clear. Making no headway in that line, one o'clock found him sober (he says) and of mind to go home and to bed. On Union avenue he met a man by the name of Joseph Brandt. Brandt was a laborer and had been at work in a sewer in Independence. This twain were strangers up to that time but, striking an acquaintance, had their midnight lunch together. Brandt's object in being abroad so late was to find a person by the name of "Charlie Ross." Ross (the record tells us) was not the poor lad whose mysterious disappearance aroused sympathy a generation ago, but was a party for whom Brandt had gone security for a board bill. Unfortunate (but not unusual) results followed that assumed contractual obligation. The tongue of rumor coming to Brandt on that cold night located Ross in the regions about the Union depot, and in sauntering in his search for him, Brandt left Riggs. A few minutes later we find Mr. Brandt at the open window of a lunch counter on Union avenue. There he ordered a dish of beans and mustard, yclept "*chilli,*"—time, about 1:15 a. m. This homely illustration of a light nocturnal lunch in a great city recalls a trait of John Gilpin's good wife, of whom it was said:

"That though on pleasure she was bent,
    She had a frugal mind."

While eating his beans and mustard a car passed him going towards the Bluff street bridge. It turns out this was the car that crushed Riggs' leg. Brandt threw his eye casually over his shoulder, noted the rate of speed of the car and testifies it was going about five miles an hour. He did not know at the time Riggs was hurt, but heard it weeks afterwards when they met by chance on the street and compared notes. Going back a little, when Riggs left Brandt his intention was to walk up town but changed his mind when he got to the

bridge, inquired of two passing men where cars stopped to take on passengers, and, obeying their directions, he undertook to cross defendant's tracks to reach the point indicated, when he was run down by a car going west. He was then, as we understand it, on the bridge. He jumped to avoid this car but in the leap was struck by it on the body and was thrown so that his head hit a rail of the bridge with such violence that he was knocked insensible. The next thing he knew was that a car coming from the west smashed his left leg. Doubtless the great weight of the reliable testimony shows that Riggs, in a stupor from overindulgence in liquor and lunches, with the idea of going to bed filling his muddled mind, wandered on the bridge and straightway sank into a drunken slumber close to the track with his leg over the rail. We say doubtless this was so, because there is evidence indicating that his coat was off. The motormen who ran west-bound cars were on the stand and none of them saw him in their westward trips. No such accident was reported by any of them. No wounds or contusions were found on his head telling of contact with the rail, nor any wounds or contusions on his body indicating a blow from a moving car; and while plaintiff says he was sober, yet there was a mass of evidence pointing to his drunkenness from those familiar with the effects of liquor.

But this phase of the case is not a controlling one. It would seem to matter little in the law whether plaintiff negligently lay down to a drunken sleep with his leg on the track (as argued by defendant) or whether he negligently crossed the track so close before a car that he was knocked against an iron rail and became unconscious from the blow (as argued, *contra*). Either event accounts for the predicament he was in. Defendant was to blame for neither, but, in either, had no right to afterwards negligently crush his leg.

In this condition of things it was vitally material to plaintiff's case to show that he was unconscious, did not know of his leg being on the track and was unable to move it from the track. As said, he tried to make a case by showing he was unconscious, thus avoiding his contributory negligence and bringing himself within the humanitarian rule.

Now, if plaintiff was unconscious it follows that any evidence of his attempting to reconstruct the transaction and draw a verbal picture of *how he lay after his fall, or of when his leg got on the track, or of how the trunk of his body reclined, whether partly bolstered up or prone, is of not a particle probative force.* It may not be amiss to quote from plaintiff's testimony on that score. At one place he says, speaking of his head striking the railing of the bridge: "I don't remember much of anything after that, until I was run over by the east-bound car." At another place he says: "After I fell and hit my head against the rail of the bridge, I don't know anything until I was hit by the second car." At another place he says: "I have a slight recollection of this car approaching [the car that crushed his leg], it seems I saw the light of the car and made an effort to get up but I couldn't, and after the wheel had passed over me of course I tried to get up; I guess I got up of my own account and more than the others helping me up." He was then asked by his counsel: "Q. Then the first thing that you recollect after you were knocked unconscious was what—after you were knocked unconscious by striking your head there—what was the first thing you recollect after that?" The answer was: "The first thing I remember I was run over by this car and then picked up." On cross-examination he testified as follows:

"Q. Do you know where your left foot was after you had been knocked over in that position? A. No,

sir, I didn't know anything at that time; I was unconscious after I fell.

"Q. You don't know what position you were in? A. No, sir.

"Q. You don't know what position your right foot was in? A. No, sir.

"Q. The only way you can tell your left foot was on the track is that the car ran over it? A. The car ran over both feet.

"Q. But it crushed your left foot? A. Yes, I was laying with my left side towards the track and left foot over the track with my head towards the west and my feet towards the northeast.

"Q. What I want to get at, Mr. Riggs, is whether you know, after you were knocked unconscious into that position, of your own knowledge, at that time, where your feet were, or are you just assuming they were in that position because the car ran over them? A. *When I fell, I didn't know; I was unconscious after I hit the bridge, but after I was run over it was an evident fact that my feet were both over the track.*

"Q. So the first time you knew you were in that position was after the car had run onto you? A. *Yes, sir, I had no knowledge of it before.*

"Q. You were completely dazed up to that time? A. I was.

"Q. But the car running over you roused you up some, so you knew what position you were in? A. Just before it hit me I heard the rumbling of the car, and saw the light and made an effort to get up, but I was dazed then.

"Q. Did you know then that your feet were on the track? A. I didn't.

"Q. And you didn't know, as I say, that your feet were on the track until the car ran onto them? A. After the car passed over me I knew I was badly hurt and that the car ran over both feet.

"Q. From that time on were you perfectly conscious? A. I was unconscious for a little while; I was hurt so bad that I couldn't tell how bad I was hurt; my left limb pained me considerably."

The object in so fully setting out Riggs' testimony is this: Plaintiff's ingenious counsel conceived the plan of reconstructing the transaction by going to the spot in the nighttime a year after the event and making experiments in stopping cars. To this end he had plaintiff locate himself in the position he claims to have been in when first struck by the car. During a series of experiments Brandt was also so located. Both of these men were seated as if on the floor of the bridge, the trunks of their bodies practically upright, their heads slightly inclining forward and their left legs (plaintiff having got an artificial one) over the rail. In that condition photographs were taken and put in evidence, a sample of which we here reproduce, viz:

Riggs v. Railroad.

Objections were made to these photographs which were at first sustained but finally overruled. The objections may as well be considered on the demurrer, because if the photographs were properly in evidence as true representations, then they materially bear on the ruling on the demurrer. There was a mass of evidence pro and con on the question whether the electric, the star, moon and other lights, the condition of the clouds and other causal incidents were the same at the taking of the photographs as at the event. Defendant contends they were not; but, allowing to plaintiff the most favorable view of the testimony, we conclude the circumstances under which photographs were taken were so nearly like those surrounding the event itself that the photographs were admissible, provided we determine that plaintiff was located at the spot he was hurt and the position of his body and leg was the same as at that time. In that view of the case, we are constrained to hold that plaintiff's own evidence was without any probative force in reconstructing his place and position. It would be a dangerous and daring innovation to permit a man made unconscious by a blow on the head to locate the position of his limp body and limbs during the time he was temporarily dead.

We find no fault with plaintiff's proposition of law, *viz*: that experiments and their results are admissible proof when it is first shown that *causal* conditions and circumstances are substantially reproduced at the experiments. That view they maintain by an array of authority cited in their brief (*q. v.*). The true rule seems well put in 17 Cyc. 285, *viz*: "The conditions of a relevant occurrence may be artificially created in an experiment. Where the material facts bearing on a particular issue are precisely duplicated in the experiment the result may be received in evidence, the burden being on the proponent to show the correspondence in essentials."

Holding that the evidence of plaintiff himself was without value in reconstructing his position and location when struck by the car, as we do, there is left to him only the testimony of the eye-witness, the motorman McPhail, to which we will presently advert. Before doing so, we observe that the significance of the experiments appears when (assuming plaintiff puts himself in the right place and position in the pictures) it was demonstrated by them and shown by the experimental evidence that the rays from a headlight of a car from the west fell full on him at least forty feet away. That, when so located, he became visible to a motorman that far away; and further demonstrated in sundry instances that a motorman, knowing nothing of the experiments but believing during them that he saw a person in danger, commenced to check his car (loaded, going at a rate of, and with the same appliances as the car doing the harm) from twenty-five to forty feet away and brought it to a standstill before it reached the danger point. In this connection it is well to state that it is undisputed there was an arc electric light on the southeast corner of the Bluff Street bridge. This light threw shadows from the columns of the superstructure of the bridge, and it is practically admitted by plaintiff that if he was on the track at the exact spot his leg was crushed, then he lay in the shadow of the bridge column or behind it. Several witnesses for defendant who were on the car saw the postition of plaintiff after the car had run over his leg and they unanimously put him at that time in the shadow and hid by the pier. We say plaintiff practically concedes that fact—witness one of several such statements in his brief: "When first struck by the car that ran over the plaintiff he was not lying in the shadow of the bridge column, but was lying in said shadow after he had been shoved or dragged four or five feet, and the car stopped."

Now, if plaintiff was lying four or five feet further to the west when first struck he would then be out of the shadow under the experimental testimony, the whole situation would change and he would be visible as much as forty feet away. Plaintiff contends, as pointed out, that he was struck by the car and shoved four or five feet in the shadow or behind the column before his leg was crushed. He so testified, he says he was shoved into the dark by the car. *But (as said) for the purposes of justice evidence establishing a fact should come from the quick and not from the dead—from conscious, not unconscious men.*

Attending to the testimony of the motorman: In his examination in chief he gives this version of what happened:

"Q. And, as you were approaching the bridge, and as you got out of the principal part of the curve, I will ask you to state what, if anything, took place after that? A. After I got out of the curve, I noticed some object laying there right behind the pier of this bridge.

"THE COURT: Mr. McPhail, you will have to talk louder; the jury cannot hear what you are saying.

"Q. How far away from that object were you— was your car—the front end of your car, when you first saw this object there you speak of? A. I was probably six or eight feet from it, I should judge.

"Q. State what happened—what you did—as soon as you saw that object? A. As soon as I saw this object I immediately threw off the power and reversed the car. I stopped as quick as possible. . . .

"Q. And did you afterwards, or at any time, find out what the object was there that you speak of? A. Yes, sir.

"Q. What was it? A. It was a man.

'Q. Where was he, describe the position he was in as you saw him? A. Why, he was laying down when I seen him.

"Q. Which way was his head? A. His head was towards the pier of the bridge.

"Q. Would that be west or east? A. It would be towards the west.

"Q. And where was his feet? A. His feet were towards the east.

"Q. And where were his feet with reference to the rail of the track? A. One foot was on the rail and the other one was close to the rail.

"Q. Where did your car stop with reference to this man? A. Why, he was laying by the rear wheel when the car stopped.

"Q. In front of the rear wheel or back of the rear wheel? A. In front of the rear wheel."

Further along he said that as he left the Union Depot and approached the bridge he was "looking straight ahead up the track"—was "keeping a general lookout to see if there was anything on the track." Asked about his headlight and how it cast its rays, whether it would cast them on the persons lying there on the bridge, he answered: "No, sir, the headlight didn't strike any object on that side of the track."

On cross-examination he said he made a written statement to plaintiff and his counsel and some accompanying parties about three months after the event. Shown exhibit No. 1 and having his attention called to the letter "R," he testified that plaintiff was lying a little east of the letter "R." Further along this occurred:

"Q. Now, Mr. McPhail, when this car struck this man, how far did it shove him before it run over him; about how far? A. I couldn't say how far it moved him.

"Q. It moved him four or five feet, didn't it? A. *I couldn't tell whether it moved him or not.*

"Q. Well about four or five feet? [Witness makes no answer to this question.]

"Q. It shoved him the way the car was going four or five feet didn't it? A. It probably shoved him that far."

In effect he further testified that he recognized plaintiff as a man on that night by looking over his right shoulder and glancing down out of the vestibule window when the nose of the car was over him or "just about that;" that he stopped his car so quickly that the rear wheels did not pass over his leg—say, in ten or eleven feet. During his cross-examination and for the purpose of impeachment his signed statement, made to Mr. Latshaw, plaintiff's counsel, was put in evidence. It contains the following: "I didn't notice whether Mr. Riggs was laying straight out or sort of bunched up. When the car struck Mr. Riggs the car shoved him along on the track about four or five feet from where I first saw him—shoved him in the same direction which the car was going." Counsel then presented two photographs similar in outline and detail to exhibit No. 5. And it was from testimony then delivered by him that the photographs went to the jury. Asked if he recognized "that [Exhibit 5] as a good picture of that bridge and the way things were there at the time you approached that bridge just before you ran over that man," he answered: "It is a good picture of the bridge. *The man was lying down as I approached here.*" Reminded by counsel that he had stated in his said written statement that he "didn't know whether he was lying down or not," he answered that he "didn't notice whether Mr. Riggs was lying straight out or sort of bunched up when the car struck Mr. Riggs."

We infer from the context in the record that the foregoing answer was a part of what counsel read from the statement instead of being a reply by the witness on the stand, because the following appears:

"MR. JOHNSON: This is not his testimony now.

"THE COURT: Don't interrupt his examination.

"MR. JOHNSON: I think I have a right when he makes a statement of that sort to make an objection and state the contrary.

"THE COURT: I think not, Mr. Johnson, *when he reads the exact words of it;* if he doesn't state the exact words that would be different.

"To which ruling of the court the defendant duly excepted at the time.

"Q. Let me read you this Mr. McPhail: 'I didn't notice which way his head was, but think it was towards the west, with one leg on the track; he was laying about three feet from the first pillar on my right as I was going; that is to say he was towards the bluff from the pillar about three feet.' Then I read you this statement: 'I didn't notice whether Mr. Riggs was laying straight out or sort of bunched up'— now isn't it a fact that you didn't notice whether he was laying straight out or bunched up?

"MR. JOHNSON: I object to that as assuming that he was bunched up and it doesn't show anything of the kind.

"Objection overruled; to which ruling of the court the defendant at the time duly excepted.

"Q. Was he laying straight out or bunched up when you saw him first? A. *He was laying straight out.*"

Further pressed, the witness testified that plaintiff "was lying—I couldn't tell whether he was bunched up or not."

Then the following occurred:

"Q. That picture shows him bunched up, doesn't it? A. That looks a little as if he was sitting up.

"Q. Don't you see his head there?

"MR. JOHNSON: I object to his arguing to the witness.

"Objection overruled; to which ruling of the court defendant at the time duly excepted.

"Q. Don't you see him leaning against that pillar with his shoulder and neck?

"Mr. Johnson: I object to that, as the picture shows for itself how it is.

"Objection overruled; to which ruling of the court the defendant at the time duly excepted. ·

"Q. You don't know whether that man was lying down straight or bunched up, like that in the picture when you first saw him?   A.  I couldn't say whether he was sitting up as much as the picture shows.

"Q. You couldn't say whether that photograph— the figure in that photograph is setting up a little more or less than he was when you struck him?   A. No, sir.

"Q.  Now it is a good, fair representation of everything there; just exactly as it was at the time you came up there just before you ran over him; is that a good, fair, accurate representation of that place and the conditions around there at that time?

"Mr. Johnson:  I object to that for the reason that the witness has not shown himself qualified to speak about that.

"Objection overruled, to which ruling of the court the defendant at the time duly excepted.

"Q.  Is it, Mr. McPhail?   A.  It is not very dark there.

"The Court:  Answer that question 'yes' or 'no.' A.  *No, sir, I don't think it is.*

"Q.  What is the matter with it?   A.  It shows up a little plainer than the object did as I seen it.

"Q.  Any other objection to it?   A.  No, sir.

"Q.  With the exception that it looks to you now as though the object looks plainer to you than it did then, is it all right with that exception?   A.  It appeared so sudden.

"Q.  I don't ask you how sudden it appeared.

"Mr. Johnson:  I think the witness has a right to make his answer.

"The Court: Finish the answer.

"To which ruling of the court the plaintiff at the time duly excepted.

"A. (Continuing.) The object appeared so sudden that I couldn't see just exactly how it was laying there.

"Q. Is that a true and fair picture; a true picture of just the way that thing looked there at the moment you saw him just before you ran over him? A. Yes, sir, I think it is.

"Mr. Latshaw: We offer that picture in evidence.

"Mr. Johnson: I object to its introduction, for the reason that the picture shows itself that the object is sitting up, while every witness who has testified to the position the plaintiff was in at that time testified that he was lying down.

"The Court: Is that your only objection?

"Mr. Johnson: And it is not shown that this picture was taken under the conditions that existed at the time plaintiff was run over.

"The Court: Objection overruled. Show it to the jury."

Such was the evidence. Giving to plaintiff what is mete on demurrer, *viz.*: the full force of his own competent testimony, even if contradicted, giving him the benefit of all the uncontradicted testimony including the most favorable inferences to be rationally deduced from all the evidence, yet we are of opinion that McPhail did not testify and never intended to testify on the stand that the dummy figures looming up in the pictures were a true representation of plaintiff's position on the night of this unhappy accident. Nor, as we see it, is there any *evidence* that plaintiff was shoved four or five feet from the light into the darkness in which he lay when the car went over his leg. McPhail's admission made off the stand to plaintiff's counsel in that behalf might discredit him as a

witness, but would not prove the fact or bind defendant. The last general question propounded to the witness and his general answer lends a little countenance to the notion that McPhail there inferentially admitted what he had repeatedly denied. He had over and over again repudiated the picture in certain vital details, while conceding its correctness as to the bridge, including in that description tracks, slats, columns and railings. In giving life to his mental attitude on the stand, a just interpretation of his general answer must be referred to his specific denials of correctness in certain details and his specific admissions of correctness in broad outlines. It will not do to twist any other meaning out of it inferentially. If, now, it is sought to make him say that Riggs was sitting conspicuously upright as shown in the picture and five feet away in the light as shown by the experimental evidence then the witness should have been asked plumply and specifically if he desired to change his former testimony, or if the upright position of the figure in the picture was a true representation of Riggs' position on the track. So radical a change should not be hid away under the cloak of a general question and general answer and got at by inference. On this view photographic exhibits five and three should have been excluded.

It results unavoidably that experiments and results of the experiments based on locating dummy figures as seen in exhibit five tended to mislead the jury. Defendant's motormen stopping cars on the nights of the experiments, did not stand in the shoes of McPhail on the night of the accident. They saw human figures prominently displayed sitting upright close to the rail and at a place where their headlights struck them in time to see and to stop. McPhail saw in the shadow of the column the dim outlines of what turned out to be an unconscious man apparently lying

down. When he grasped the danger, he seems to have acted with due diligence.

We conclude it was error to refuse the peremptory instruction.

II. The conclusion reached in paragraph one renders useless the consideration of other assignments of error.

The judgment is reversed.

All concur.