PAULINA BAECKER, Appellant, v. MISSOURI PACIFIC RAILWAY COMPANY.

Division One, February 29, 1912.

1. NEGLIGENCE: Witness's Scruples. A witness has a right to his scruples and to say he cannot testify that a man on the railroad crossing could be seen by a man in the engine cab, but could testify that the man could be seen from a coach.

2. ————: Man on Track: Seen by Engineer of Approaching Train: Hypothetical Question. Where there is no testimony that the track was straight, it is very material to know where the man struck by the engine of a fast coming train is located by the hypothetical question, whether at the crossing, as the question assumes, or one hundred feet west of it, as the testimony shows, and whether in the middle of the track or on one side of it, and whether the outlook is from the cab, as the question assumed, or from a coach, as the witness testified.

3. ————: ————: ————: Peril Discoverable. Where the case does not turn on a violation of a statute or ordinance relating to train signals at crossings or speed, but proceeds on the theory that no bell was rung or whistle blown, and the negligence of the pedestrian in voluntarily taking a position .of deadly peril too near defendant's railroad track, with no regard for his own

safety is beyond question, and he was struck by an oncoming train, while he was walking on the track, or between it and another, into which position he had shortly before come, and there being no showing that he was actually seen in peril by those in charge of the train, it is plaintiff's duty to show that by due care they could have so seen him in time to save him.

4. ———: ———: ———: ———: No Right to Expect Clear Track. Assuming that the place where decedent was struck by the train was one where defendant was entitled to a clear track, but had no right to expect one, yet to hold defendant liable for his death he must have been in a position of peril long enough and far enough away for defendant's servants in charge of the train to have seen him in time to have avoided striking him. Where the evidence is that he was walking in a place of safety betweeen the ties and at the last was seen on the ends of the ties, but there is no evidence of how long or how far he walked on them, there is no room for the application of the humanitarian doctrine, since being in a place of safety the law will presume he remained there until proof is produced showing that he moved into one of peril long enough before he was struck to give the train servants a chance to save him.

Appeal from Gasconade Circuit Court.—*Hon. R. S. Ryors*, Judge.

AFFIRMED.

*Breuer & Hensley* and *August Meyer* for appellant.

(1) The court erred in sustaining the demurrer to plaintiff's evidence, at the close of her case. A demurrer to the evidence admits every fact which the jurors may infer, if the evidence were before them, and should be sustained only when the evidence thus considered fails to make proof of some essential averment. Koerner v. Car Co., 209 Mo. 141; Rine v. Railroad, 10 Mo. 228; Bender v. Railroad, 137 Mo. 242. (2) Under the evidence introduced, plaintiff was entitled to have her case submitted to the jury, under the humanitarian doctrine, as upheld by the Supreme Court of this State, and the court erred in overruling

plaintiff's motion to set aside the nonsuit. Chamberlain v. Railroad, 133 Mo. 587; Morgan v. Railroad, 159 Mo. 262; Reyburn v. Railroad, 187 Mo. 565; Eppstein v. Railroad, 197 Mo. 720; Lynch v. Railroad, 208 Mo. 1; Ahnefeld v. Railroad, 212 Mo. 280; Murphy v. Railroad, 228 Mo. 56; Young v. Railroad, 227 Mo. 307; Fearons v. Railroad, 180 Mo. 208.

*C. D. Corum* for respondent.

(1) The presumption obtains that trainmen in charge of a train did their duty. Bluedorn v. Railroad, 108 Mo. 439; Jewett v. Railroad, 50 Mo. App. 547. The engine was moving at a slow rate of speed and the engineer had a right to presume that the deceased, if in danger, would—as he could easily have done—step far enough away to avoid any contact with the passing engine. Carrier v. Railroad, 175 Mo. 470; Chamberlain v. Railroad, 133 Mo. 604; Koegel v. Railroad, 181 Mo. App. 379; Hawkins v. Railroad, 135 Mo. App. 533; Skepton v. Railroad, 82 Mo. App. 142.    (2) A mere "I did not hear" is entitled to no weight in the presence of affirmative undisputed evidence that signals could not have been heard, if given, on account of the noise made by a nearby engine blowing off steam. Henze v. Railroad, 71 Mo. 638; Cathcart v. Railroad, 19 Mo. App. 118; Culhane v. Railroad, 60 N. Y. 137; Bohan v. Railroad, 61 Wis. 391; Railroad v. Givens, 18 Ill. App. 404.

LAMM, J.—Negligence. Plaintiff sues for $10,000 damages for the death of her husband and, cast below on a demurrer to her evidence, appeals.

Morrison is a way-station on the main line of the Missouri Pacific railroad on the east side of Osage county. Gasconade is the first way-station east of Morrison on the same railroad and is located near the west bank of the Gasconade river in Gasconade county. Hermann is the capital of Gasconade county and the

next station east of Gasconade on said railroad. Washington is a station on the same railroad on the east side of Franklin county and a good way east of Hermann.

On. the 9th day of November, 1907, one Frank boarded defendant's train as a passenger at Washington and took passage to Hermann, near which place he lived. Drowsy from liquor he straightway fell asleep on the train and, passing Hermann, continued both his slumber and trip to Gasconade where he got off. By this time he was partly sober, but, as if the hair of the dog was good for the bite, at once began drinking himself into a worse befuddled condition, in which predicament we leave him for the present.

Taking up another thread of the story, at about five o'clock of the morning of November 9, 1907, Hermann Baecker (husband of plaintiff) left his home six miles away to go to Morrison, there to take passage on one of defendant's trains east to Hermann, to do some banking business. What bitter ill wind blew him elsewhere, or how and why he got to (or off at) the village of Gasconade is dark; but 11 a. m. of that day finds him there in company with Frank in a tippling house called Chill's saloon south and east of defendant's depot.

At that time there was an engine coupled to a freight train and headed east with steam up, standing on the side track at Gasconade. At that very time also a regular passenger train was due to pass west on the main line. We infer from a bit of testimony that Frank and decedent planned to interview the conductor of that freight train to see if he would carry them both east to Hermann. At any rate they left the saloon in company at that time and walked north on a little path (connecting the saloon and depot) to the tracks, there they turned west at a right angle around the nose of the freight engine, and proceeded toward the depot. Presently Mr. Baecker was struck by the

engine of the west-bound passenger train running very fast and was so grievously hurt that he died that afternoon in the town of Hermann, where he was carried. So much for an outline of the general facts. Further on we will state the immediate facts upon which plaintiff relies to recover.

Attending to the pleadings, the petition alleges a customary user of the track by pedestrians at the point of the accident with the forbearance and tacit consent of defendant for many years; that the track was straight there for a long distance east, and that while decedent was "walking on said track and right of way of defendant" he was struck and mortally injured by defendant's train; that defendant's servants and agents in charge of the train either saw or by ordinary care could have seen his peril and that he was unaware of the approach of the train; and that afterwards they negligently failed to warn him by bell or whistle and negligently failed to use the brakes or other appliances provided for stopping the train and putting it under control before it struck him, but on the contrary negligently ran its train against deceased, injuring and killing him.

The answer admits certain conventional allegations in the petition, and then denies generally each and every other allegation thereof. Next it pleads the contributory negligence of decedent in walking upon the track or dangerously near the same immediately in front of the train without looking or listening, without heeding any warnings given by defendant's employees, or taking any care to avoid his own injury and in such close proximity to the train that it was impossible to stop the same and avoid his injury; and that decedent was a trespasser upon defendant's track.

The reply put in issue the new matter in the answer.

In addition to facts already stated, plaintiff put in proof tending to show from Frank that he did not

know how decedent and he got on the other side of the freight train. He did not know whether they got across, climbed over or went around it, but they got around it some way. This witness (the main one) does not say that Mr. Baecker at any time looked for a train on the main line after he passed around or over the freight train, but does say that he (witness) did not see one. Neither does he say that they got on the railroad track itself when they passed around the engine and turned to the west. That is to say, it is left dark whether they (either or both) were on the track, or were between the main track and the side track at the start of their journey west, and the best we can conclude is that Frank did not see Baecker again until "just as he got struck." The record explains that in this way: Presently a brakesman on top of the freight train hailed Frank who stopped at the hail. The brakesman then chided him for remissness in hospitality in not taking him along to the saloon. During this talk Mr. Baecker left Frank and walked on. There is no testimony showing that Frank kept his eye on him. When he was fifteen or twenty steps ahead of witness the brakesman shouted "look out!" Witness then turned and looked east and saw the coming train. Referring to said distance, witness said he meant to say that Mr. Baecker was ten or fifteen steps from him when he was struck. "When the train (engine?) had passed," says the witness, he looked and saw Mr. Baecker with his hands behind him walking outside the track on the ends of the ties. When witness first saw the train it was about one car-length behind him (witness). The cross-beam of the engine struck Mr. Baecker and the next Frank saw of him he was lying on the side of the track. The wind was blowing, the train was not making much noise, and witness heard no signal by bell or whistle.

On cross-examination Frank would not say whether there was a whistle blown or bell rung, but

reiterated that he did not hear any. He admitted he had stated to others that he was so excited that he did not remember whether the whistle blew or not. He reiterated that he did not know whether he and Baecker had passed around the head of the engine or got through or over the train. At the time the brakeman called to witness, he "was in the middle of the track and Mr. Baecker was along side of the ties . . . when he saw him he was walking on the outside of the track, between the two tracks, on the outside of the ties, between the rails." Witness saw him "just as he got struck." He could not say how many steps he took and witness did not see Mr. Baecker when he turned to cross over on the main track. Witness himself was in no danger when the brakesman shouted, "look out!" because he was between the two tracks. When he looked ahead he saw Mr. Baecker about as far away as "across this courtroom." He locates this time as being after witness had his attention called to the train by the brakesman's shout, and then he turned and looked east and saw the train and then looked for Mr. Baecker. He could give no distances because, he said, he was "a little bit intoxicated." Frank also testified that the engineer could see a man where Baecker was from the train, but he does not say at what distance.

Mr. Vandewerken testified that he was sitting in his yard reading a newspaper under a shade tree about seventy-five feet north of where decedent was killed. He saw decedent and another man walking around the head of a freight engine taking water at the tank. They then walked toward the depot "in the middle between the two tracks." (Note: there was no testimony as to how far these tracks were apart.) After that time witness next saw Mr. Baecker after the train had passed to the west. He did not hear the train coming, heard no signals and testified that he could not have

heard any. He heard the freight engine blowing off and making "a great racket" and he saw the passenger train and heard some one say, "It hit somebody." He testified also that there was a boat-landing at the bridge east of the village on the Gasconade river and that people used the track to go to the boat-landing and return.

On cross-examination it appears that the witness could not hear well. As he was born in 1829, he was seventy-nine years old at the time of the trial. The record also shows the following question and answer: "Q. Then when you saw the men walking up did you know just where they were? A. Well, I thought they were then between the two tracks. I looked up and I saw the two men walk around in front of the engine, and they walked on like they were between the two railroad tracks. Then I just kept on reading my paper and directly I heard someone say that a man was killed. I looked up and the train had just about stopped then."

By Mrs. Vandewerken it was shown that she saw the passenger train after it struck Baecker and heard no signals; also that people used the track to go to the river and return, "people used it every day almost, it is used as a footpath." This had been going on for twenty-three years. Being asked whether they walked on the track or at the side, she replied: "They walked all over it if they felt like it, the main track or side track, wherever they took the notion to walk."

Dr. Haffner testified that he saw Mr. Baecker at Hermann, he described his injuries and that he died shortly after surgical attention. Witness had known him for thirteen years, and as far as he knew his sight and hearing were good.

By Mr. Mumbrauer plaintiff proved that he lived at Hermann and went at the solicitation of plaintiff's attorneys to take photographs and measure distances at Gasconade. It seems there is a road crossing over

the tracks there, and there was testimony indicating that Baecker was struck about one hundred feet west of this crossing. The testimony of this witness is brief and we give it practically entire.

"Q.  I will ask you to state, if a man standing upon the track of the Missouri Pacific Railway, at the crossing east of the depot in Gasconade city, or near that point—how far east from where a man was on the track could he have been seen by anyone up in the cab of an engine?

"Objected to as incompetent and immaterial, not tending to prove any issue in the case.  Furthermore, for reason that no witness has testified that deceased was upon the crossing or near the crossing at the time he was struck by the train.

"Mr. Breuer:  We can supply that.

"The Court:  I think there is some evidence.  Objection is overruled.

"Defendant excepts.

"A.  Well, I do not know how far a man could see out of a cab of the engine, but out of a coach you could see a man.

"(Objected to.)  No ruling.

"Q.  Go ahead.  A.  Well, I do not know how far you could see out of the cab of an engine.

"Q.  How far could you see a man standing on the track, supposing him to be at or near the crossing—how far east from that can a man be seen standing on the track?

"Objected to as immaterial, not being an issue. (No ruling.)

"Q.  Well, on the crossing east of the depot, in the middle of the track, how far east could he have been seen?

"Objected for the same reason given.  Overruled Defendant excepts.

"A.  You can see a man from the east—you first get a glimpse of him forty-four steps east end of side-

track. You can get a plain view of him at east end of the side track.

"Q. How far is that? A. Two hundred and fifty-eight ordinary steps.

"Q. So then 258 steps east of the crossing—from that point a man is in plain view standing at the crossing? A. Yes, sir.

"(Witness excused.)

"Mr. Breuer: That is our case."

I am instructed to say for the brethren that we are all of one accord in the opinion that the ruling below on the demurrer was well enough. This, because:

The case made either on the pleadings or facts does not turn on a violation of any statute relating to train signals at crossings, nor upon the violation of any town ordinance relating to such signals or to speed. Cases of that sort are therefore not in point.

The case may, however, proceed on the theory that no bell rang or whistle blew. Whether there was a duty due to decedent in that regard and whether such omissions make a case for the jury depends on other conditions presently considered.

One prong of the alternative allegation in the petition, to-wit, that defendant's servants in charge of the train actually saw decedent in peril in time to save him, is not sustained by any proof, hence is out of the case.

There is left the other to be presently reckoned with, to-wit, that they might have seen him in danger if they had used due care in looking for him.

The allegation that the track was straight for a long distance east is not proven. True there is some faint testimony tending (or intended) to show how far from the east a man could be seen. But a fair review thereof demonstrates how lax and inconclusive it is. Let us attend to that phase of the case. Mumbrauer is the main witness to the point. In a hypothetical

question a man is put on the track "at the crossing or near that point" and the witness is asked how far away he could be seen by any one in the "cab of the engine." On objection made to that question as not within the issues and that there was no testimony decedent was at or near the crossing when struck, counsel stated, "We can supply that." Thereat the court overruled the objection, accompanying his ruling with the remark, "I think there is some evidence." He does not put it on the offer of counsel to supply. Now, we look in vain in the record for that evidence. So, we look in vain for any testimony supplying it as counsel proposed. Counsel do not complain (nor indeed could they well do so) that they were lulled into false security by the remark of the trial judge that he thought there was such testimony. They knew as much about what evidence they had put in as he did, and the testimony put in theretofore was that decedent was struck about one hundred feet west of the crossing. The witness finally answered he could not tell how far a man could be seen out of the "cab," but proposed to tell how far he could be seen out of a "coach." Then the following was propounded: "Well, on the crossing east of the depot in the middle of the track, how far east could he have been seen?" That question was challenged for reasons theretofore assigned against the first—one of them being, as said, that it did not tend to prove any issue in the case, another being that there was no testimony showing decedent was at the crossing. To this we may add there was no testimony that decedent was in the middle of the track. The objection was overruled, and we think erroneously. But that error was in favor of plaintiff and fills no office on plaintiff's appeal. The witness went on to say, in substance, that a plain view could be had of such a man 258 steps east of the crossing. There are more reasons than one why this testimony has no probative force. To begin with them, the engineer and fireman

were in the cab of the engine, not in a coach of the train. They were defendant's servants at whose door negligence is laid. The witness had said in the same breath that he did not propose to testify to the distance a man in the cab could see a man on the track— he could only testify, he said, to an outlook from the coach. Why this was so we do not know, but the witness had his scruples and they are entitled to respect. Presumably, therefore, he was testifying about a man in the coach, and it is likely he had experimented from the coach. To continue with reasons, the decedent was not at the crossing when struck. To end with reasons, the testimony did not locate decedent in the middle of the track as the question did. If testimony *aliunde* had shown the track to be perfectly straight for a great distance, as the petition alleges, then some of the given reasons would deserve little weight. But absent any proof on that score, as here, it is a live and very material matter to know where the man to be seen is located by the hypothetical question, whether at the crossing or one hundred feet west of it and whether in the middle of the track or on one side of it, or whether the outlook is from the cab or coach.

Plaintiff undertook, and was about, the serious business of charging the unfortunate death of her husband to the negligence of the engineer and thereby taking $10,000 from the money chest of defendant and transferring it (with a good title) to her own pocket. In so grave a matter as that, her proof must rise to the dignity of her case, so that if a jury find the issues for her the court could say there was testimony of substance on which the verdict could rest. Failing to show, as she did, that her husband was actually seen in peril it was at least her duty to show that by due care he could have been so seen in time to save him.

As we see it the case stands this way: The negligence of decedent is beyond any question. He voluntarily took a position of deadly peril, too near defend-

ant's track, with no regard whatever for his own safety. However tenderly his conduct be viewed, yet he belongs in the class of those of whom it is said they have eyes and see not and ears and hear not, though the unmistakable signs of danger and possible death were on every hand. Nothing in law can sponge away the legal effects of that fault and make his death actionable, except there be shown subsequent negligence of defendant's servants in not preventing his death when with due care they could have seen him in time to have done so. Plaintiff under the humanity rule was obliged to make such a case, or be cast. She failed, as we have seen, and was rightly cast.

There is yet another view leading up to the same end. Assuming for the purposes of the case that the place decedent was struck was one where defendant may have been entitled to a clear track, but had no right to expect one because of the customary presence of persons there by its acquiescence (a theory scantily supported by the proof, but sufficiently so under the admissions of defendant's brief), yet to hold defendant liable decedent must have been in a position of peril long enough or far enough away to allow the humanity doctrine play; for, if he was in a position of safety between the two tracks and appeared in a position of peril on the ends of the ties so shortly before the engine struck him that he could not be saved by warning or stopping, then it matters not that at last and too late he might have been seen in peril by the engineer; for under the humanity rule his death is not actionable.

It is not necessary to cite authorities to sustain that proposition. Our reports abound with them. The very point was up and ruled in the very last case handed down by this court on the law of negligence. [Dyrcz v. Railroad, 238 Mo. 33.]

Now, in this case there is not a particle of testimony (as we read the record) tending to show that

decedent was in danger while the train ran any particular distance. The chief witness, befuddled with liquor, however leniently and tenderly his testimony be weighed, is unsatisfactory and does not make a case for plaintiff on that point.

We may pause with some little profit to moralize a bit on the testimony of Frank. What a man sees when half seas over (we speak with becoming reserve) is seen as through a glass, darkly—i. e., dimly, inexactly, uncertainly, as in a vision, a mist or a fog. There is a very old adage in a dead language, *In vino veritas,* but it is of doubtful or no use in the administration of justice as a precept in sifting and applying testimony. We opine, at all events, it should be construed strictly, that is to say by its *letter.* Observe, it does not say there is truth in all the possible variety of drinks sold in Chill's saloon in Gasconade.

It seems from all the testimony, Frank's included, that decedent was not on the track at all. It seems, too, there was a place of safety between the two tracks and Frank, the drunken man, put himself in that place of safety. It seems decedent at the last was walking on "the ends of the ties," but how long and how far did he walk on the ends of the ties? Where was he walking before that? There are no satisfactory answers to those questions in this record. How long were the ties? Did walking *anywhere* on the ends of the ties necessarily put him in danger? There is no answer to those questions in this record. Absent proof on these vital points, if we are to indulge in mere presumptions or speculations, we would presume he would walk in safety up to the time the actual proof showed he was not doing so; for the natural instinct to preserve life is so strong that he must be presumed to exercise due care to preserve it, until, as said, the proof steps in and rebuts the presumption and shows he did not. Clearly he was in danger at the instant he was struck by the cross-beam of the engine. So much the sequel

shows.    But to recover he must be shown to have been within the danger zone long enough and far enough to give defendant an opportunity, a last clear chance, to save his life.    This is so, even if defendant's servants were bound, as they were, to look out for him and are chargeable with seeing all that ordinary care in looking would discover.    The case fatally breaks at this point as well as at the other.

The learned trial judge did right in taking the case from the jury.    The judgment is affirmed.    All concur, except *Graves, P. J.,* who did not sit.