A. L. ALLEN ET AL., RESPONDENTS, v. THE CHICAGO, ROCK-ISLAND & PACIFIC RAILWAY CO. ET AL., APPELLANTS.—54 S. W. (2d) 787.

Kansas City Court of Appeals.  October 3, 1932.

*Ed Robison, O. L. Linck* and *Mytton, Parkinson & Norris* for respondent.

*Luther Burns* and *Culver, Phillip & Voorhees* for appellant.

TRIMBLE, P. J.—This is an action brought by plaintiffs (parents of Mary Wilma Allen, who at the time of the tragedy hereinafter set forth, lacked twenty-four days of being two years old), to recover $10,000 for the alleged negligent killing of said child in the operation of defendant's train, shortly after noon of August 3, 1927.

The individual defendants are respectively, the engineer and the fireman in charge of the train that struck and killed the child.

There was a verdict and judgment in favor of plaintiffs in the sum of $7,000. The defendants appealed to the Supreme Court on the theory that, in addition to other errors, a constitutional question had been raised and was in the case, but that tribunal thought otherwise and transferred the case to our court.

Each defendant offered a separate demurrer to the evidence which demurrers were all overruled, and the correctness of the court's action thereon is the most important point in the case. It is necessary, therefore, to state the testimony, together with all the inferences that can reasonably be drawn therefrom, in the most favorable light to plaintiffs.

The railroad runs in an easterly and westerly direction along the south side of the city of Maysville, the south line of the right of way being the southern city limits. The station or depot is on the north side of the track and immediately east of Water Street the main street leading from the south into said city, it being a paved thoroughfare with sidewalks. It is not thickly settled in the locality of the depot. Plaintiffs' house is about 887 feet east of the depot and is from 150 to 200 feet north of the railway track.

And an unpaved road or street leads east from Water Street along the north side of the right of way and between it and plaintiffs' home. At said home an east and west dirt road is intersected by an unpaved road running north into the city. Immediately east of plaintiffs' house is a path which extends therefrom south to and across the right of way. At a point where this path crosses the ditch north of the railroad, timbers and ties have been thrown therein which formed a small bridge, or causeway so to speak, used by persons in going to and up defendant's track, and for many years persons living in the southeastern part of the city used this causeway and this path in going to and from the depot. Between the railroad and plaintiffs' home there had been, in former times, a fence, but this had been trampled down. With the permission of the railway company, plaintiffs had planted a garden on the right of way on the north side thereof. About

ten or fifteen feet east of the point where the above mentioned path came to the railroad track, there is a cattle guard. It was between this point where the path came to the track and the cattle guard on the track that the child was struck and killed by an eastbound freight train. Plaintiffs' home is north and a little west of the cattle guard. Between the depot and this cattle guard the track curves slightly toward the south. The track is slightly upgrade toward the east, that is, higher than the street or roads adjoining the right of way on the north.

The vegetation had been removed for a distance of six or eight feet on each side of the track. On other parts of the right of way there was a growth of grass and short, but no high, weeds. Looking east along the track, there was nothing to obstruct the view of the engineer and the firemen from a point one quarter of a mile west of the station to a point east of the plaintiffs' home.

On August 3, 1927, the date of the killing, plaintiff, Frankie Allen, was at home with her four children, Maurine, age eleven and one-fourth years, Anna eight, Carl five, and the deceased, Mary Wilma, nearly two. The husband, A. L. Allen, was not at home until after the child had been struck. At some time between ten and eleven that morning, Mrs. Allen went, with her four children, from her home north of the track to a point on the south side of the right of way to pick dewberries. She carried Mary Wilma who could have walked but was barefooted and her mother carried her on this account lest she hurt her feet. They went to a place on the right of way a short distance west of the cattle guard, but remained only a short time and then returned to the house about eleven o'clock. The mother busied herself about the house preparing a late dinner (at the early morning request of her husband), until about one o'clock when the eastbound freight train, which struck and killed Mary Wilma, passed.

It seems that after the mother and her children had returned from their first berry picking trip, Maurine and Carl "slipped out" of the house and again went across to the south side of the right of way to pick and eat berries at the place where they had been shortly before that day. Mary Wilma did not go with them. When last seen by her mother, she was on the porch of the home about fifteen minutes, or "something like that," before the train passed. At this time when last seen by her mother, the latter gave Mary Wilma a small plate of berries to eat. (She had walked ever since she was nine months old and could talk "as plain as anybody" and her health had always been good.) The mother did not know Mary Wilma went, how she went or with whom. In fact the mother did not know the child had gone from the porch. She, being at work getting dinner as stated, heard the train go by, and knew it was a freight by the "racket" it made. Hearing the children, or rather Maurine, hollering and cry-

ing'' and ''calling for mamma,'' she rushed out and found Mary ''laying right by the ties, right at the edge of the ties'' on the north side of the track, west of the cattle guard and ''right at the path'' hereinbefore mentioned. ''She was laying face downward.'' With reference to the rail and ties, ''she was laying right between two ties, touching the railroad track, the rail'' on the north side. The train was ''on down the track further.'' She could hear the roar of it, but she did not actually see it.

The foregoing presents the case in general outline, showing the physical situation and the surroundings at the time. Thus far, there is no evidence even tending to show when the child left the house and went to the railroad and to the point where she was struck nor the manner and speed of her going. No one saw her leave the house or saw her arrive at the railroad; and, with the exception hereinafter to be noted, no one saw her from the time the mother gave her the berries at the house, up to or just at or about the instant she was struck. Hence the demurrers were asked on the ground that there was no sufficient evidence to support a finding, or raise a legal inference, that the child was on or so near the track as to be in a situation of peril a sufficient length of time for the engineer and the fireman to have seen her and to have stopped the train before striking her.

Witness, Asa Bridges, is the one witness (constituting the exception above noted), who saw the child between the time her mother last saw her and the moment she was killed. This witness was fifty-four years old, had lived in Maysville twenty-seven years; he had lived about seven years at the time of the fatal accident, in the southeast part of town, on the north and south street forming the junction, hereinabove mentioned, of the two unpaved dirt roads at the plaintiffs' house and north of said home. This witness testified to the fact that people, for at least twenty-seven years, had been in the habit of walking on the track east from the depot up to the Allen home on the east; that the fence was down and the people went through the gate between the house and the barn on defendant Allen's property and out onto the railroad, the right of way fence being ''down so you could go through.'' There had been a fence at one time, but ''there was kind of a path and the fence was trampled down'' to the bottom wire which was about eight or ten inches high. Other witnesses testified to this user of the track by pedestrians.

Witness Bridges further testified that on the day in question he had been picking berries some distance east of the Allen home along the right of way. That he was there after dinner having gone back about one o'clock; was there picking berries ''just a short time'' after dinner. He didn't know the exact length of time he left there to go home, ''couldn't say exactly'' but that ''I think it was between one and two o'clock.'' He left home about one and ''didn't stay

but a short time," "wouldn't know how long he picked berries" after dinner, "probably not over an hour. Maybe a little longer." Then he went back to the Cook place and there entered the road along the north side of the right of way, and went west alongside of the right of way to the Allen house. He saw Mr. Allen's older girl, Maurine, and the little boy picking berries on the south side of the right of way east and south of the cattle guard. He said he also saw the little girl that got killed. "When I first saw her she was at the north line and had her hand down on the rail and stepped over one. *When she got in the middle* she straightened up and acted like she was coming back across the track.

"Q. What did you do? A. I stopped and looked at her a little bit. I saw this little girl (the older one) and boy picking berries and I supposed she was going over to them and I came on home."

"Q. Where *was she the last time you saw her?* A. *She was standing in the track.*"

He further said that she was at this time "about in a line with the path that was east of Mr. Allen's house and led to the railroad. After seeing her standing in the track, he walked to his home, *a distance of half a quarter* (625 feet). He couldn't say how long he had been there, he went into the garden "and started to work only a short time." He didn't remember how long he had been there, "just a short time, something like fifteen minutes." That he then heard an eastbound train whistle "a considerable distance (west) from the depot." It was two long and three short blasts, he was pretty sure it was "brake sticking." From the sound of the whistle and the time the train took to get to the depot, he thought it gave these whistles "nearly half a mile west of the depot, and then later when the train was quite a little ways west of the crossing," he did not know how many hundred feet, he heard the train give the whistle for the crossing at the depot.

Bridges further testified that he lived "about half a quarter, maybe a little more than half a quarter," north of Allen's house; and later when asked if it was a quarter of a mile north of Allen's house, he said, "No, I think it is about half a quarter."

On cross-examination he testified that when he first saw the little girl that was killed, she was climbing over the rail of the track. She didn't act like she was able to step over the rail, he saw her put her hand on the rail and put her feet over it, he didn't know exactly how far she was from him, but would say he was between eighty and 100 feet from her. He saw what he called the twelve-year-old girl, with the five-year-old boy, picking berries on the south side of the right of way. When asked if the child "appeared to be trying to cross the track to get to the other children" he replied, "Something like that." He did not know where the child went, as he walked home half a

quarter. He couldn't say how long he had been there when he heard the train. He went into the garden and "started to work only a short time." He didn't remember how long he had been home when he heard the train coming; "just a short time." When pressed to say whether it was five, ten or fifteen minutes he said, "Something like fifteen minutes." The train was "nearly a half mile west of the depot" when he first heard it whistle, two long and three short blasts, which he was "pretty sure it was" "brake sticking" and then later he heard it whistle for the crossing at the depot. He didn't know how far from the crossing it was when it whistled for that "but quite a little ways." He was asked, "You knew the little girl was on the track when you passed?"

"A. Yes, sir, I saw it.

"Q. And you heard the train coming? A. I didn't hear it at that time.

"Q. You knew later at the house that the train was coming. A. Yes, sir."

Witness further said he didn't think the train whistled, after it whistled for the road crossing at the depot, until after it got past the Allen place.

The child, Mary Wilma, was not seen again by anyone after Bridges last saw her "standing in the middle of the track" until the instant she was struck by the train.

Maurine Allen, the dead child's sister, testified that she was twelve years old on May 2nd (next before the trial which began June 18, 1928. So that she was eleven years and three months old when her sister was killed.) She testified that after her mother and all the children had gone to the house, she and her brother Carl went back to a place "southeast of the cattle guard on the south side" of the right of way to pick berries to eat. *Her sister Mary did not go over there.* She, the witness, looked out and saw the train coming along, it was going east. She saw her sister when she saw the train. She said she "couldn't say" how far away the train was from her sister. The latter was "on the north side of the north rail, standing up looking." When witness saw her, witness "began to holler and scream. Mamma heard me and came and got there the same time I did." The train went by and "I seen the train hit her." She, witness, did not know Mary had come out there, until she saw her.

On cross-examination, she said this "was between one and two. I can't remember now."

Under further cross-examination, witness further testified that when she first saw Mary she was "standing up on the north side of the north rail," west from the cattle guard.

"Q. You say she was standing up on the rail? A. Yes, sir.

"Q. What do you mean by the rail? A. That iron rod.

474

"Q. You mean the iron rail? A. Yes, sir.

"Q. She was standing up on that? A. No, down aside of it.

"Q. On the end of the ties? A. No, sir.

"Q. How far was she from the ties? A. I don't know.

"Q. Could you show the jury about how far you would say she was from the ties? A. I don't know; don't think I could.

"Q. Can you point out anything in the courtroom to show the jury, chair or anything? A. No.

"Q. You don't know how far she was from the track? A. No, sir.

"Q. How far were you from her when you say you saw her there? A. About three times as far as across this room, or four."

She further testified that the fence which runs across the right of way to the cattle guard, and which she had described as being "mashed down" was between her and Mary. She couldn't get to her very quickly.

She was asked, "How long did you see Mary standing there?" A. I just seen her when the train just hit her; I began to holler and Mamma came and picked her up."

"Q. How did you know there was a train coming? A. I happened to hear it.

"Q. What was it you heard about the train? A. The noise.

"Q. Did you hear any whistle? A. I don't remember now.

"Q. How close was the train to Mary when you saw it? A. *I don't know; pretty close I have an idea.*

"Q. How close would you say? A. I was so scared.

"Q. How close would you say? A. I couldn't say.

"Q. Can you point out anything, show the jury? A. No.

"Q. You don't know how close? A. No, I don't have an idea.

"Q. If you can, Maurine, I would like for you to tell us how close the train was to Mary when you first saw the train coming. If you can't, all right. A. I don't think I can, I was so scared.

"Q. The first you saw of Mary, she was standing there at the place you mentioned when the train was coming? A. Where?

"Q. That is the first you saw of Mary after you went out to pick berries? A. I don't understand.

"Q. Did you see Mary when she started from the house to come out there? A. No, sir.

"Q. The first time you saw her was when she was standing down there a piece from the track, you can't say how far—was she just standing still? A. I don't know what you mean.

"Q. When you saw Mary you say the train was coming and close to her—was Mary standing still, or moving? A. *Standing still.*

"Q. Standing perfectly still—was she as far as from me to you, from the track? A. Oh, no, she was on the track.

"Q. On the track? A. Yes.

"Q. Whereabouts on the track—on the ties, on the rail, between the rails, or where? A. Not on the ties; I think sitting on the rail.

"Q. She was sitting down on the rail? A. Oh, no, standing.

"Q. What did you mean when you just said she was sitting on the rail?

(The witness did not answer.)

"JUDGE CULVER: That is all."

Thereafter, when plaintiffs rested, the demurrers were offered and overruled, and defendants introduced their evidence.

The engineer testified that there were twenty-two loaded cars in the train; that there was nothing wrong with the brakes; that he sounded the whistle about 800 or 1000 feet west of the station; that he continued to sound it until he reached Water Street and thereafter did not sound it until after reaching the point where the child was run over. In his deposition he testified that the train was going from thirty to thirty-five miles per hour as it went through Maysville; that he could have stopped within a distance of 1000 feet with safety to the train and persons on it; that the train was not scheduled to stop at Maysville and did not stop there; that the track east of the station curved to the right, "bends away from the fireman towards the engineer. In other words, as we speak of it, I can see all the way around the curve on my side. Q. You are on the inside of the curve? A. Correct. Q. Now as you went along there that day there was nothing to prevent you seeing anybody upon the track or at the immediate side of the track, was there? A. No, there was not. . . .

"Q. If there had been a child on the track or within two feet of the track on the north side of it as you approached the depot at Maysville from the west and traveled east there would be nothing to prevent your seeing the child, had you been looking for over one thousand or twelve hundred feet? A. No, I don't know just about how far you could see a little child from the depot. There is nothing to prevent me seeing anything on the track."

The evidence shows that for a distance of 650 feet east of Water Street, or from the east end of the station, the right of way is 300 feet in width; that from that point east 227 feet, or to the cattle guard, the right of way is 150 feet in width. A great number of witnesses for the plaintiffs testified to having seen blood and hair on the ties at or near the west side of the cattle guard and near thereto. Bridges said that the blood and hair was "about in a line with path, maybe a little east of the path." "Q. Where was it with reference to the cattle guard? A. I judge twenty feet west."

As said heretofore, defendants contend that their instructions in the nature of demurrers to the evidence should have been given for the reason that there is no evidence that deceased was on or near

the track in a position of peril for a sufficient length of time for the engineer or the fireman to have seen her and stopped the train before striking her; that what deceased did between the time she was seen by Bridges and the time she was seen by Maurine Allen when she was killed, is not shown by the testimony; and that any inference as to where she was between those times is mere speculation.

It is defendants' view that least thirty minutes must have elapsed between the time Bridges last saw deceased and the moment she was killed. Our view is that the jury could properly find that it was much less than that. In the first place the witnesses *estimated* said time as being "something like" fifteen minutes; and the jury had reasonable grounds for thinking it was less than that. The mother says that to the best of her knowledge it was "about fifteen minutes." "Something like that" from the time she last saw little Mary on the porch until she heard the train pass and then the screaming. The distance of the house from the railroad could be found by the jury to be 150 feet rather than 200. It was only 625 feet from where Bridges was standing, (when he last saw Mary standing in the track), to his home, and turned to walk there. A man, at an ordinary walk, can travel three miles, or 15,840 feet, in an hour, or 264 feet per minute. At this rate he would travel the 625 feet in something less than three minutes and then have ample time to work "just a short time" in the garden before fifteen minutes had entirely elapsed. If he proceeded at the rate of only two miles per hour he would have been going at an extremely slow speed, but even at that languid rate, it would take only a little over three minutes to reach home and go into his garden, and work "just a short time" when he heard the train whistle "a considerable distance west of the depot" or "nearly half a mile west of the depot." As it was going thirty to thirty-five miles per hour, and the train whistled, as the engineer said it did, 800 feet west of the station or 1687 feet west of the point where the child was killed, it would require less than a minute to traverse the last mentioned distance. So that we have no ground on which to say the jury could not find that it was even less than fifteen minutes from the time Bridges last saw her "standing in the track" until she was killed.

Now, it is undoubtedly true, as a matter of law, that before any liability can attach to defendants, the child must have been on or so near the track as to be in a position of peril a sufficient length of time next before the tragedy, to reasonably allow the engineer time to see her and stop the train before striking her, and the evidence *must be such as to show this,* or legally raise inferences (each supported by evidence appropriate thereto, and not by another inference or other inferences) that such was the case. [Hamilton v. K. C. Southern Ry. Co., 250 Mo. 714; Baecker v. Missouri Pacific Ry. Co.,

240 Mo. 507; Newell v. Dickinson, Receiver, Chicago, Rock Island & Pacific Ry. Co., 207 Mo. App. 369; Justus v. St. Louis-San Francisco Ry. Co., 224 S. W. 79; and Ayers v. Wabash R. Co., 190 Mo. 228.]

But is it true, as defendants assert, that *any inference* as to where the child was during the sufficient length of time next before the injury, required to create liability, is "mere speculation" or arises from an inference based on another inference or inferences, and not from evidence properly and separately supporting it or them? The great difference between this case and the above cited cases on which defendants rely is that the child is shown "standing in the track" when last seen by Bridges, and still visible and unquestionably within the danger zone at the moment Maurine looked up and saw her and the approaching train. The length of time between these two was short; there is *no evidence, nor inferences arising from any evidence, that the child had gone elsewhere,* or out of sight so that she could not have been seen by the operatives of the train if they had been looking, as they should have been on account of the user of the track from the path near which she was struck, on west to the depot. The inference which defendants draw that she *may have wandered out of sight* and danger, during the short time in question and before she was struck and then *returned* to the danger zone just before being killed, *is itself an inference* without testimony to support it, and therefore is *mere speculation.* To escape liability, the defendants *assume* she left the track and its immediate vicinity but returned to the danger zone in time to be struck. But an assumption with no evidence or inference to legally support it, is weaker and of less force than either or both of the things just mentioned. There is no evidence that the child ever crossed the track and made even a start toward where Maurine and Carl were on the south side of the right of way. She was standing still on the track when Bridges last saw her; and she was still standing or sitting in plain sight just outside the rail, but within the danger zone, when Maurine saw her. There is some confusion in Maurine's testimony as to where her (the child's) feet or lower extremities were when struck, or as to just the precise distance they were from the rail, but the jury could well consider that Maurine was on the sloping side of the right of way south of the track and across it and northeast from Mary when she saw the child with the train approaching it, and hence could not say precisely where the child was or what she was doing. She *saw the train strike the child* and hence there is again no reason for the further assumption that the child may have toddled into the danger zone and been struck by the *side* of the train and knocked against the ties and killed in that way after the engine had gone by. As the child was on the other side of the

track from Maurine, the latter could not have seen her, if struck by the *side* of the train after the engine had passed, because the train would, in that event, have been between the two children.

When Maurine looked and saw the child close to the north rail and ties, the train, she says, "must have been pretty close" to her; this, however, was when she first looked up and saw both train and child. The child was standing still, it is no showing whatever that the child had just entered the danger zone too late for the operatives to see her and stop. It was no evidence that the child had come into the danger zone so close to the train as to allow the engineer no opportunity to avoid the injury. It is also true that it is no evidence that she had been there a sufficient time; but there are no permissible inferences that the child had ever *gone out* of danger and *then returned* into it. The inferences are the other way. The child was barefoot; it must have been unpleasant, if not painful, to have moved any appreciable distance over the track, ties and cinders in bare feet on this August day between one and two o'clock in the afternoon. The inference is also that the child had been "playing" there, for the mother says that when she found the child's body, it had a cinder clasped in each hand. No one says she ever went across the track toward the other two children. Bridges says that after she had gotten over the north rail and had "got in the middle she straightened up and acted like she was *coming back across the track*," which was in an opposite direction from the children; and that she was standing in the middle of the track when he last saw her.

When Maurine saw her, she did not have to be there but slightly over twenty seconds before that to have enabled the operatives of the train to see her and act effectively to save her, because the train could have been stopped in 1000 feet and since the train was going thirty-five miles per hour, it could come that 1000 feet in twenty seconds. In that or a greater space of time this child, barefooted, especially as the positive evidence shows she experienced difficulty in climbing over the rails, could travel only a very short distance. So that with the evidence showing that when last seen before the train came, she was *standing still* in the middle of the track, and at the time when the train was coming, she was also standing still within the danger zone outside of the north rail, the inference is legitimate that she had moved only the short distance from the middle of the track to the spot where she was struck, *especially* as there is *no evidence whatever that she went anywhere* else, but had been playing in the cinders.

In the Hamilton case, *supra,* relied upon as destroying any case for plaintiffs here, the court say, on page 721, that there was "no evidence that defendant . . . had any reason to expect any persons, other than trespassers to be on the track at the spot where the

deceased was killed." He had been properly put off the track at a proper place, was drunk and knew it, and secured the services of another to conduct him across a bridge, who did so and then left him, at one o'clock in the night, to continue on his way for a mile or more before he was killed, which last fact was not known until his body was found the next day, but with no evidence to show, and no legitimate inference from any proven fact, "that he was *seen or seeable* on the track in a position of peril and at a distance sufficient to permit the stoppage of the train." The evidence in the other cases cited *supra* are likewise devoid of any evidence or of any inference legitimately supported by any evidence, that the death was caused by any negligence on the part of the defendant railway.

In the Baecker case, *supra*, there was no evidence that he was actually seen in a place of peril in time to have stopped, and no evidence either *direct or inferential* that he was in danger and *could have been seen*, long enough before the tragedy to have avoided it. Deceased when last seen was *between* the tracks, not in a place of peril, and *when* he got into danger was not shown either by direct evidence or by proper inference. The same is true of the other cases.

With no evidence whatever, either direct or inferential, that the little girl in the case at bar went, or was seen, anywhere outside of the zone of danger, and these other facts hereinbefore discussed tending to show that she could not have gone any appreciable distance over the rough and cinder-covered track where she was first and last seen before the injury, it is a legitimate inference that during the short time the train was traveling from a point 800 or 1000 feet west of the depot to the place where the tragedy occurred, the child was either on the track or so near it as to be plainly visible and in a position of extreme peril; and that too without building one inference upon another. An inference is a deduction which may properly be made from any facts legally proved. [Merkel v. Railway Mail Assn., 226 S. W. 299, 301.] And while it is true that there may be a concatenation of any number of inferences in a given case, yet each of these must rest on its own facts and no one can be based upon another or a preceding inference. [Hamilton v. Kansas City Southern Ry. Co., 250 Mo. 714, 723.] "An inference may be and often is retroactive; that is to say a trier may from present conditions infer a previous fact." [Cross v. Passumpsic Fiber L. Co., 98 Atl. 1010, 1015.] "While the *presumption* of the continued existence of a proven fact does not run backward, yet the surrounding circumstances may be such as to justify the *inference* that an established fact must have existed at a certain time in the *immediate past*. 22 Corpus Juris 92." [State v. Janes, 1 S. W. (2d) 137, 138.] (Italics ours.) We are, therefore, of the opinion that the question whether the little girl was in a position of peril for a sufficient length

of time for the engineer, in the exercise of ordinary care, to have stopped the train and thus avoided injuring her, was a question for the jury. The demurrers and the instructions in the nature of demurrers were properly overruled. See Dempsey v. Norfolk & W. Ry. Co., 71 S. W. 285; Gunn v. Ohio River R. Co., 28 S. W. (2d) 680.

We do not agree with the proposition that, in order to find for plaintiffs, the jury must necessarily have found not only that the train operatives saw the child in danger in sufficient time to have stopped, but also, with cold-blooded deliberation, ruthlessly murdered her by running against her and snuffing out her tender life. We think that the jury need not have found any such thing, but that the jury could, by evidence direct and legitimately inferential, find that the train operatives *were not looking,* at a time and place where they were required to be on the lookout, and that *if they had been looking,* they could readily have seen the little girl in deadly danger a sufficient length of time before reaching her to have stopped the train and thus avoided killing her. If that be true, and we think it is, i. e., that the jury legally have so found, then the case should not have been taken from the jury and the court properly disposed of the demurrers at the close of plaintiffs' evidence and the instructions in the nature of demurrers at the close of the whole case.

The engineer and fireman both say they were looking but there was evidence from which the jury could find that they were not; and if there was such evidence, even though slight, the jury were not compelled to believe them.

There is no question but that a child on, or so near, the track as this one was when she was struck, was easily visible to an operative of a train on the lookout for persons likely to be on the stretch of used track in question; and that the user of the track was undoubtedly sufficient in character and length of time as to require the operatives to be on the lookout, and to make the humanitarian rule apply though the person in peril was not actually seen, if by keeping reasonable lookout, or by the exercise of ordinary care, such person could have been reasonably seen. [Slergen v. St. Louis-San Francisco Ry. Co., 286 S. W. 729; Ahnefeld v. Wabash R. Co., 212 Mo. 280.]

Since certain objections are made to plaintiffs' instruction No. 1 submitting the case, it is perhaps well to set out the charge of negligence contained in the petition. It is as follows:

". . . carelessly and negligently ran said engine in approaching said point and against, upon and over said Mary Wilma Allen, without keeping a lookout for persons and children and the said Mary Wilma Allen upon said track; that the defendant railway company acting through its engineer, William J. McReynolds, and its

fireman, Forest Hudson, defendants herein, and the defendants William J. McReynolds and Forest Hudson, in the exercise of ordinary care, could, would and should have seen Mary Wilma Allen upon said track and in a position of danger of being struck by said engine in time to have stopped said engine and train of cars in the exercise of ordinary care, and carelessly and negligently failed to give any warning of any kind or character to warn said child from said track, and to warn adults who might be near to assist said child and remove said child from said railway track; that said engine and train of cars, through the negligence of the defendants, in the manner aforesaid, was run against, upon and over said child."

. . .

It is urged that plaintiffs' said instruction is erroneous in that it authorized the jury to find for plaintiffs if the operatives of the train failed to give warning of its approach by sounding the whistle or ringing the bell. The instruction is as follows:

"1. The jury are instructed that if you find and believe from the evidence that A. L. Allen and Frankie Allen, the plaintiffs herein, are the father and mother of Mary Wilma Allen, deceased, and that at the time of her death Mary Wilma Allen was a minor under the age of two years; and you further find from the evidence that on the 3rd day of August, 1927, Mary Wilma Allen was struck by a locomotive engine then being run on defendant company's railroad by its engineer, William J. McReynolds, and its fireman, Forest Hudson, and that she was thereby so injured that her death resulted therefrom; and you further find from the evidence that at the place where said Mary Wilma Allen was struck by said engine (provided you find she was so struck) on said 3rd day of August, 1927, and for many years prior thereto, many people were accustomed to and did use said track as a footpath and passageway to and from points in the southeastern part of Maysville and beyond, and that said track had been so used in this way continuously for many years on and prior to August 3rd, 1927, and that the defendant company and its engineer and fireman in charge of said train could reasonably have expected to find persons on said track at said point on said date on account of the frequent and continuous use thereof by pedestrians if you so find, and that no signal or warning was given by the defendant company and its engineer and fireman in charge of its said engine as it approached the point where the deceased was on said track (provided you find she was on said track), and no efforts were made by them to prevent injuring deceased by stopping said train or giving warning of its approach: and if you further find from the evidence that the defendant and its engineer and fireman could, by the exercise of reasonable care have seen the deceased upon said track (provided you find she was thereon) a sufficient distance

ahead of said engine to have stopped said engine and train and avoided injuring deceased, or if you find and believe from the evidence that the defendant and its engineer and fireman could, by the exercise of such care as would be used by a reasonably prudent man under like and similar circumstances, have given signals and warnings and thereby have avoided injuring deceased, but that defendant company and its engineer and fireman in charge of said train through their carelessness and negligence (if you so find) either failed to observe deceased upon said track (provided you find she was thereon) or failed to give signals or warnings or to stop said train and avoided injuring deceased, then the jury should find the issues for the plaintiffs, notwithstanding they may believe from the evidence that deceased was on said railroad track without legal right, and was guilty of negligence in being there.''

Boiled down, the above objection to the instruction is that the failure to sound the whistle or ring the bell is not negligence in any event, or rather, perhaps, that doing so would not have caused a child, only twenty-three months old, to leave the place of danger and thus escape injury. We are unwilling to declare *as a matter of law* that the engineer of a train approaching a two-year-old child need not sound an alarm for the reason that it would do no good as the child would be incapable of understanding and of making use of the warning by getting out of the way. Whether the child would understand and act upon the signal depends upon the facts and circumstances of each case including the particular child in question. The vital question is, not whether the warning signals should be given in such a case, but whether the alarm sounded would likely be effective in getting the child to move out of danger. It must be remembered that, in this case, a movement of a foot or two would have carried her out of the danger zone. She was not *on* or *in* the track at the time the train approached. She was *outside* at the *end of the ties,* at least the jury could rightfully find that she was there. Such movement out of danger could have been quickly and *instinctively* made. The scream of a locomotive and its appearance as it thunders down toward one, *even an adult*, and even though close to but not directly at or upon him, is terrifying both in sound and sight, and the instinctive fear roused thereby, together with the instinctive desire of a child to flee from danger, would doubtless cause it to at least step back away from the terrible object approaching. In addition to the location of the child so near the point of safety, the evidence shows she was rather a precocious child, being able to walk at nine months of age and to talk plainly at the time of her death. She had lived for several months in proximity to the railroad and doubtless absorbed some idea of the danger incident to the passage of a train. When the failure to give the alarm is

submitted as one of the negligent bases of the case under the circumstances where, owing to the tender age of the person, the vital question is, as heretofore stated, whether the alarm would likely be effective, the instruction submitting such ground of negligence should also submit whether in the judgment of the jury the alarm would have effected an avoidance of the danger, but this was done in the instruction under consideration because immediately after the statement about the giving of a signal or warning, the instruction contained the words, "*and thereby have avoided injuring deceased,*" etc. In the case of White v. St. Louis & San Francisco R. Co., 20 Mo. App. 564, the question of failure to sound an alarm, was held to be a question for the jury in the case of a cow, and the court remarked on page 567:

"Of course, no one could say as a conclusion of fact, taking the evidence given by the plaintiff as true, that these precautions would have prevented the accident. But, clearly, they would have rendered the happening of it less probable; and in that light, the real question was, whether such reasonable precautions were used as might have been used."

In the case of Palmer v. Missouri Pac. Ry. Co., 74 N. W. 66, 67, the court say that warnings to domestic animals are given on the theory that their attention will be arrested and their fears aroused thereby and that their natural instincts will urge them to seek safety, and that the attention of children are as quickly arrested, their fears are easily aroused and their instinct of self-preservation as strong as those of domestic animals and that "with respect to children of tender years and immature judgment a railroad corporation, to say the least, owes the duty which the law exacts from it in respect to domestic animals."

Error is also charged against the instruction in that in connection with the submission of the question of failure to sound an alarm, it did not submit the proviso that, on this feature, it was necessary that the engineer and fireman saw or could have seen the deceased a sufficient distance ahead to have enabled them to give such warning in time. The instruction so explicitly and repeatedly required the jury to find that they saw or should have seen the child a sufficient distance ahead of the engine to enable them to act effectively in time, as a preliminary finding necessary before any liability could attach, that the jury could not have been misled by the instruction into believing that the defendants were under any duty to give a warning regardless of whether the child could be seen before it was too late.

The reiterated charge that there was no evidence from which the jury could find that the child was seen or could have been seen in time for the operatives of said train to have avoided the injury, and

that the instruction is erroneous on that account, is the same question ruled on in disposing of the demurrers.

It is also claimed that the instruction is erroneous because there is *no evidence* to show that the whistle was *not* blown. By this objection appellants do not mean to claim that any whistle was blown after the train passed the depot, because their original and reply briefs disclaim any such idea, but that the whistles shown to have been given 800 or 1000 feet west of the depot (being the station whistle) and the whistle for the crossing (at the east end of the depot) also several hundred feet *west* of the depot, were sufficient to take the place of any whistle or warning after the engine passed the depot. We do not think so, for while a whistle at any moment after passing the depot and continuous thereafter until the place where the child was standing was reached, would likely frighten the child and at least cause it to step or back out of the zone of danger, any number of whistles made west of the depot would be so far in the distance as not to be regarded as a warning to the child, or have its attention attracted by them.

Finally it is said that the instruction is erroneous for the reason that, although the instruction does state that "if you further find from the evidence that the defendant and its engineer and fireman could, by the exercise of reasonable care, have seen the deceased upon said track (provided you find she was thereon) a sufficient distance ahead of the engine to have stopped said engine and train and avoided injuring deceased" and that they negligently failed to stop, yet this was not enough to authorize a verdict, for the instruction should have gone further and required the jury to also find that the operatives, by the exercise of reasonable care, could have seen deceased upon the track *in time thereafter, by the exercise of ordinary care and with safety to themselves and others on the train*, to have stopped the engine and avoided the injury. The italicised words are not in the instruction, and hence it is claimed the instruction is erroneous. In other words, the instruction fails to limit the negligence of the enginemen to their negligence in that respect *after* they saw or should have seen the child on the track by the exercise of ordinary care, and also fails to tell the jury that the care they should *then exercise* in stopping the train, would be the care they could reasonably exercise *with safety to themselves and others on the train*. Undoubtedly in all ordinary cases under the humanitarian rule the jury should be carefully told this else they might find a verdict against a defendant for not stopping *at all events*, even though the jury might believe that the train could not be stopped with safety after the person could and should have been seen. But was the above omission fatal error in this case where the track east from the depot to the path where the child was found or struck *was one*

*used by pedestrians* and where it was the duty of the operatives to be at once *on the lookout*, where the engineer admits a child on the track could be seen as he approached the depot, (more than 1000 feet west of the child, and that he could stop in safety in 1000 feet, and, without regard to safety, in 600 feet? If he saw or should have seen the child when he was more than 1000 feet away and thereafter could have stopped with safety within 1000 feet, and failed to do so, he would be negligently liable. If his inability to stop with safety was because he negligently failed to see the child *soon enough,* or as soon as he should have seen her, then liability would still exist because his inability to stop in safety would be because of his negligence in not seeing when first he should have seen. So that while ordinarily the above italicised words should be included, yet under the state of the conceded facts in this case and the requirements the instruction previously required the jury to find, its omission is not fatal, nor could such omission cause the jury to be misled. If it can, or might possibly mislead them, the instruction would be reversibly erroneous, but as we are of the opinion that, under the facts of this particular case, it was not harmful.

Complaint is made of plaintiffs' instruction No. 3, which told the jury that, even though they might find that either of the plaintiffs were negligent in permitting deceased to go upon the railroad track and that deceased was negligent in being upon the track, ''yet you cannot find for defendants by reason of the negligence, if any, of the plaintiffs, or either of them or of said Mary Wilma Allen as aforesaid, if you find for the plaintiffs under instruction No. 1 thereof.'' It is insisted that this instruction injected a false issue into the case to defendants' prejudice. In this connection it is pointed out that ''there was no issue of contributory negligence made by the pleadings or the evidence as to either of the plaintiffs or as to deceased.'' It has often been held that there is no error in refusing to give an instruction withdrawing an issue, such as contributory negligence, from the jury when such issue is not raised by the pleadings and evidence (Deitzman v. St. Louis Screw Co., 254 S. W. 59), but defendants have cited no case holding that it is error to give such an instruction, nor are we able to see how the giving of such an instruction in this case could have done any harm or have misled the jury.

The judgment is affirmed. All concur.