Raimondo BROCK (Plaintiff) Respondent,

v.

GULF, MOBILE AND OHIO RAILROAD COMPANY, a Corporation (Defendant) Appellant.

No. 43837.

Supreme Court of Missouri.
Division No. 1.

Sept. 13, 1954.

Opinion Modified on Court's Own Motion
Sept. 29, 1954.

Wayne Ely, Ely & Ely, St. Louis, D. S. Wright, Mobile, Ala., of counsel, for (defendant) appellant.

.Rene J. Lusser, St. Louis, Robert J. Rafferty, Chicago, Ill., of counsel, for (plaintiff) respondent.

DALTON, Presiding Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for damages sustained when plaintiff stepped from one of defendant's engines into a hole of boiling water, scalding his right foot and leg. The negligence charged and submitted was the failure to provide plaintiff with a reasonably safe place in which to work. Verdict and judgment were for plaintiff for $14,000 and defendant has appealed.

Plaintiff was employed as a brakeman on defendant's southern division between Meridian, Mississippi and Mobile, Alabama, in local freight service, setting out empties and picking up loaded cars. He had been in this service for about five years and had been employed by defendant since May 1920. On September 7, 1950, at about 10:00 a. m. at Quitman, Mississippi, plaintiff and other members of a train crew were engaged in placing four empty cars on a dead end spur or switch track leading into the Broadhead Lumber Company mill. The cars were being shoved ahead of the engine. Plaintiff was riding on the front footboard of the engine when he received a signal to uncouple the engine from the cars. The engine stopped with plaintiff about even with some iron pipes, which constituted a part of a steam jet water pump that extended a few feet above the ground immediately adjacent to the ends of the ties and about 3 feet from the corner of the Broadhead loading dock or platform. Plaintiff stepped down off the engine to pull the pin and cut off the cars when his right foot went down in a hole of boiling water, located within 2 feet of the edge of the engine, "right at the edge of the ties" and right close to where the pipes went down to the ground. The depth of the hole does not clearly appear, but plaintiff went down "to the calf" of his leg and his foot and leg were scalded. The leg was dressed and bandaged from the instep up to the knee and the scar tissue subsequently resulting from the injury now extends some eleven inches up his leg.

It is admitted that plaintiff was an employee of defendant and that both plaintiff and defendant were, at the time in question, engaged in interstate commerce. The presence of the hole into which plaintiff stepped, its location, the fact that it was filled with hot water or boiling liquid, that plaintiff stepped from the footboard of the engine into the hole and that his right leg and foot were severely scalded and burned are admitted. Other facts applicable to particular issues will be stated in the course of the opinion.

The petition particularly alleged: "(6) That at or near the northeast corner of said (loading) platform certain pipes leading from the works, engines or boilers of said lumber company run down to the ground in close proximity to said spur. * * * and from said pipes large quantities of hot water or other boiling liquid or steam was emitted and allowed and permitted to accumulate in a hole in close proximity to the west rail of said spur * * * *which condition existed at the time of the accident herein referred to and for a long time prior thereto,* and of which condition the defendant had actual notice or in the exercise of reasonable care and caution on its part should have had notice." (Italics ours.) To this allegation, defendant answered as follows: "Defendant denies that it had notice of the condition described in paragraph 6 of plaintiff's petition, and denies that in the exercise of reasonable care and caution it should have had such notice."

It will be noted that the allegations as to the existence of the hole and the presence of the hot water therein at the time plaintiff was injured, "and for a long time prior thereto," was not put in issue by defendant's answer. It is now contended that the court erred in overruling defendant's motion for a directed verdict, and in overruling defendant's motion for judgment in accordance with its motion for a directed verdict; that the evidence is insufficient to prove that defendant was negligent; that the defendant had no notice, actual or constructive, of the presence of the hole of hot water into which plaintiff stepped; that defendant was not responsible for the presence of the hole, or the hot water therein; that there was no evidence as to how long the hole or hot water had been there or that its presence could have been discovered by reasonable inspection; and that the evidence is insufficient to sustain a finding that defendant knew, or could have known, of the presence of the hole or of hot water therein in time to have remedied the condition created thereby before plaintiff's injury.

It was admitted that "on September 7, 1950, *and for a long time prior thereto,* there was located in or near the City of Quitman, Mississippi, a group of buildings *operated as a saw mill by the Broadhead Lumber Company,* which said saw mill was adjacent to defendant's main line in said city and state." (Italics ours.) The Broadhead spur was 350 to 375 feet in length and extended from defendant's main line to and along the company's loading platform. The track was in regular use by defendant. When the spur track was constructed, an excavation 350 by 12 to 14 feet was made and excessive rains would fill this area with water deep enough to cover the wheels of the freight cars on the spur track. In 1936 or 1937, to relieve this condition, a one-inch steam pipe was "tapped in" from the main steam line and extended from the boiler room to the side of the spur track and a larger pipe was installed and used as an outlet for the water and by the use of a steam jet the water was removed from the area. "The only way to get the water out, was to jet it out." Both pipes were a part of the same apparatus and "the jet" was "placed right on the ground." When the steam was turned on, a suction was created and the water was carried off in a "sucking up" process. In the "sucking up" process it would occasionally suck up sand and when the water would get low, bark, trash and other accumulation would get "in the valve—in the jet," and it would be cleaned out by hand. When the steam that operated the jet was cut off by closing a valve, the steam would remain in the pipe, and would not condense and drip out, "unless there was a leak." The two pipes were present and in use in 1949 when the witness left his employment.

Gabriel Brock, an older brother of plaintiff and a conductor for defendant, had worked in the local freight service in the southern division of defendant off and on for ten years, using the Broadhead spur until approximately two years before plaintiff was injured. He "used to see" the pipes which constituted a part of the steam jet pump. He saw them every day, except Sunday, when he worked there and "the small pipe had always had steam in it." He observed that "the steam was escaping from the small pipe * * * and dripping out at the bottom too. You could see the vapor * * * coming from the end of the pipe * * * water, hot water * * * You could tell it was hot water." He saw water around there, not plain because of the bark and rubbish around there, not a big pool of hot water, but "six inches around the pipe, approximately that * * * right around the pipe, right—came out of the pipe * * you couldn't see how much water." In his work he often walked the loading platform and saw the situation on frequent occasions from the platform. He "saw it, you might say, every day I went in and looked down." After heavy rains the place where the spur was located filled with water and it had to be pumped off through that larger pipe and off the right of way. He didn't know who pumped it off, but "they get it out of there, most of it." On the witness stand, he examined plaintiff's exhibit No. 3, hereinafter referred to, and said he was familiar with the scene and the pipes; that he recognized the place; and that "it looks just like it did, as I last remember it before this accident happened." Plaintiff's exhibits Nos. 2 and 3 show a small pipe that crosses above the loading platform and descends to the ground near the corner of the platform, and immediately adjacent to the spur track. Both exhibits also show a larger pipe that extends up from the ground for several feet and then makes a sharp "U" turn or elbow and, after several feet, it enters a larger pipe.

As to the particular conditions, observed by plaintiff, immediately before and immediately after he scalded his foot and leg, he testified that, before he stepped from the footboard of the engine, he looked down to see where he was going to step. "It looked alright, * * * couldn't see nothing but bark and chips"; that he "didn't see no steam," the "ground there looked perfect * * * with bark and stuff, just like in other spots * * *. It looked like a perfect roadbed," and a safe place to get off. He could not see any hole and didn't see it, he saw only "plywood, bark and rubbish from the mill * * * chips and

things"; that after he had scalded his foot and leg, he got upon the platform and looked down but "could see nothing but some floating bark and chips"; that he still could not see the hole; that his eyesight was good; that he wore glasses, but not walking around, as he could "see all right"; that rubbish, weeds and grass "was always there along that bank, they never cut it down"; that he had "seen those pipes sticking up"; but he didn't know what the pipes were for; that, "when it rained, there would be water there then"; and that he had never seen water being pumped off, but the track was in a gulley or sway with a bank on the side. He had worked on this Broadhead spur track every day, as long as he was able to work the local, and for five years or more, switching both ways, "switching G. M. O. box cars in there." The cutoffs from the engine were usually made either north or south of the pipes. He did not know the pipes were connected with the pump or so used. He did not know that either of the pipes was a source of hot water, or that hot water accumulated on the ground at the foot of the pipes. Neither defendant nor its agents had advised him of these facts or warned him with reference thereto and there was no sign, or warning that a hole or hot water was present or existing.

Defendant had a positive and nondelegable duty to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work and this duty followed the plaintiff whether his work for defendant was being performed on defendant's premises or on the premises of a third person. This matter was considered by this court in the case of Brum v. Wabash R. Co., 335 Mo. 876, 74 S.W.2d 566, 568, in a case where the defendant's employee, a switchman, was injured on the premises of the Polar Wave Ice Company. The court said: "Even though the hole was not on defendant's property, if defendant was using the property in the conduct of its business, and if at the time plaintiff stepped into the hole he was at the place where defendant required him to be in the performance of his duties, and if such place was not reasonably safe by reason and on account of the hole in the crossing plank, and the defendant knew, or by the exercise of ordinary care could have known, of the presence and location of such hole, and of the danger to employees in using such place in the performance of their duties in time, by exercising ordinary care, to have thereafter remedied or repaired such condition, or warned the plaintiff thereof, it was its duty to do so. * * * As between defendant and its employees, a failure to perform such duty would be negligence." And see Winslow v. Missouri, K. & T. R. Co., Mo.App., 192 S. W. 121, 123(1, 2); Terminal Railroad Association of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 476(2), 1 A.L.R.2d 290. The defendant was of course under a duty to inspect the spur track at reasonable intervals and to use ordinary care in such inspections to keep the premises in a reasonably safe condition for plaintiff's use. Winslow v. Missouri, K. & T. R. Co., supra, 192 S.W. 121, 125; Williams v. St. Louis & San Francisco R. Co., 119 Mo. 316, 324, 24 S.W. 782.

From the admissions as to the continuous operation of the mill over a long period, the regular use of spur track in placing cars at the loading platform and from the evidence concerning the type, kind and location of the jet pump and its method of operation in sucking up water, sand and debris, the necessity for the removal of water from the track, the existence of a hole in 1948 and the size, condition and the appearance of the hole and area about its location in 1950, the jury could infer and find that the hole in question was not of recent origin, but had developed gradually over a long period from the use of the pump; and that the hole had been in existence for a sufficient period of time and was of sufficient size and depth for defendant in the exercise of ordinary care to have discovered its existence prior to the time of plaintiff's injury and in time to have remedied the condition prior thereto. While the presumption of the continued existence of a proven fact does not run backward, yet surrounding circumstances may be such as to justify an inference that an established fact must have

existed at a certain time in the immediate past. Missouri Power & Light Co. v. City of Bucklin, 349 Mo. 789, 163 S.W.2d 561, 564; Allen v. Chicago, R. I. & P. R. Co., 227 Mo.App. 468, 54 S.W.2d 787, 793. The facts and circumstances shown concerning the hole, its location and appearance bespeak its prior existence for a considerable period.

■ From all of the above facts and admissions, the fact that for a period of more than ten years the smaller pipe had always had steam in it and on frequent occasions steam was seen escaping therefrom with vapor rising and water dripping from the bottom or end of the pipe, with steam and vapor open to view and with hot water present, so that when one looked he could see the conditions, the inference could be drawn that the defendant in the exercise of ordinary care and by inspection at reasonable intervals could have discovered such condition and remedied it before plaintiff was injured. While plaintiff's testimony showed the presence of scalding water only on the day of his injury and his brother's testimony was limited to conditions existing prior to two years before the injury, yet in view of the continued operation of the mill, the continued use of the spur track and the necessity for the removal of water after heavy rains, and with no evidence of any change of condition, an inference could be drawn as to the continued existence of the several facts. Where the existence at one time of a certain condition or state of things of a continuous nature is shown, the general presumption arises that such condition or state continues to exist, until the contrary is shown by either circumstantial or direct evidence, so long as is usual with conditions or things of that particular nature. Missouri Power & Light Co. v. City of Bucklin, supra, 163 S.W.2d 561, 563–564; King v. Missouri Pac. R. Co., Mo.Sup., 263 S.W. 828, 833; Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 31 S.W.2d 21, 26; Dean v. Kansas City, St. L. & C. R. Co., 199 Mo. 386, 397, 97 S.W. 910.

■ While there is no direct evidence or admission that the hole in question or the hot water therein had been in existence for any particular length of time, we think the evidence is sufficient to support an inference that the hole had been in existence for a sufficient time and that it had been of sufficient size and depth to have been discovered in the exercise of ordinary care and by reasonable inspection of the premises. The evidence is sufficient to support an inference that the presence of hot water in the hole should have been reasonably anticipated. By reasonable inspection and in the exercise of ordinary care, the defendant would have known that the presence of hot water in the hole and around the steam "jet pump" was to be reasonably expected and was reasonably probable and that the hole might be full of hot, scalding water at any time. On the record presented, we must and do hold that the evidence is sufficient to support the essential conclusion that defendant had notice, actual or constructive, of the presence of the hole of hot water into which plaintiff stepped and that the issue of defendant's negligence, as charged and submitted, was for the jury.

The facts in evidence here distinguish this case from Thompson v. Thompson, 362 Mo. 73, 240 S.W.2d 137; Hatfield v. Thompson, Mo.Sup., 252 S.W.2d 534; Small v. Ralston-Purina Co., Mo.App., 202 S.W. 2d 533; Winslow v. Missouri, K. & T. R. Co., supra; and other cases relied upon by appellant.

Our finding that a submissible case of negligence was made disposes of appellant's contention that instructions Nos. 1 and 5 are erroneous because there is no evidence to support the finding submitted that defendant knew, or in the exercise of ordinary care could have known, of the presence of the hole of hot water in time to have remedied the condition created thereby before plaintiff was injured.

■ Appellant has also assigned error on the court's refusal of instructions B and C offered by defendant. This matter has not been preserved for review because not mentioned in defendant's motion for a new trial. Williamson v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 295, 303;

Block v. Rackers, 363 Mo. 508, 256 S.W.2d 760, 763; Section 512.160, subdiv. 1 RSMo 1949, V.A.M.S.; Supreme Court Rule 3.23, 42 V.A.M.S.

Error is assigned on the admission in evidence of certain photographs, to wit, plaintiff's exhibits Nos. 1, 2 and 3, which were taken in July 1951. Appellant contends that the exhibits were taken at a time of year when the grass and vegetation "were higher than at the time of the accident"; that the premises shown belong to the lumber company, not to defendant; that exhibits Nos. 1 and 2 do not purport to show the hole into which plaintiff stepped and tended to confuse the issues in the minds of the jury; and that exhibit No. 3 did not correctly represent conditions existing at the time of the accident because "someone had placed boards around there at the bottom of the pipes * * *, which boards were not there at the time of the accident.

■ Plaintiff testified · that exhibit No. 1 showed "the scene where I got hurt"; that exhibit No. 2 was the same scene, but closer to the loading platform; that exhibit No. 3 showed the place "where I stepped in the hole"; and that the conditions shown were the same, except for some boards. Exhibit No. 3 is a close view of the two pipes, showing their relative size and location and where they reach the ground. Exhibit No. 2 shows the same pipes in their relation to the spur track and loading platform. Exhibit No. 1 is a general and more distant view of the same location, in which apparently only the top bend of the larger pipe appears. While plaintiff admitted that weeds and grass were higher in July than in September, after it begins to die down, he said it was never cut and in the exhibits "It ain't no higher as I can tell." The exhibits were admissible as aids to the jury in arriving at an understanding of the evidence and to show the pipes mentioned and their appearance and location and their relative positions with reference to the mill, loading platform and spur track.

■ If a photograph correctly shows the situation and surroundings as far as it purports to show them, it should not be excluded because it does not show all of the detailed facts and surroundings. Hunt v. City of St. Louis, 278 Mo. 213, 211 S.W. 673, 676(3). It has often been held that photographs of locations or of objects are admissible in evidence even though taken long after the event and when changes have occurred, if the extent of such changes is explained. Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S.W.2d 96, 104; Reed v. Coleman, Mo.App., 167 S.W.2d 125, 133(15). Further, the admissibility of such evidence is largely within the discretion of the trial court, and, unless that discretion is abused, the ruling will not be disturbed on appeal. Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001, 1008; Hutchison v. Moerschel Products Co., 234 Mo.App. 518, 133 S.W.2d 701, 706; 20 Am.Jur. 607, Evidence, Sec. 727. The exhibits in question here were relevant, material and sufficiently identified and they were properly received in evidence. Williamson v. St. Louis Public Service Co., supra, 252 S.W.2d 295, 302(14) and authorities there cited; Hamilton v. Patton Creamery Co., 359 Mo. 526, 222 S.W.2d 713, 717(9). The law as declared in Gignoux v. St. Louis Public Service Co., Mo.App., 180 S.W.2d 784, 786 and in Riggs v. Metropolitan Street R. Co., 216 Mo. 304, 327, 335, 115 S.W. 969, 979 is not applicable under the circumstances shown by this record.

Appellant contends that the verdict is excessive, and so grossly excessive as to indicate passion and prejudice on the part of the jury; and that instruction No. 7 is erroneous because there is no evidence to support the submission permitting an award of damages for future pain and suffering and future loss of earnings.

Plaintiff was 59 years of age and resided on a farm where he had lived all of his life. He had only a limited education, "just went to the 5th grade." He had never done any work except railroad work. He had worked "pretty steady" for defendant from May 20, 1920 until the depression and he had

"worked steady" thereafter. His work, as brakeman in local freight service, required him "to set out cars, pick up cars, catch on moving cars, go up a ladder, go over the top, set up brakes, come back down, get off, maybe throw a switch, catch another moving car," et cetera. This work required physical agility as he had to work over all kinds of roadbed—rough or smooth. The average length of his working days had been fourteen to fifteen hours, over the 135 mile division. He had had no prior injury to his right foot and leg. His average monthly earnings had been $375 per month. From January first to September seventh, 1950, the total amount earned was $3,590.

After the receipt of his injury, plaintiff was taken immediately to a company doctor at Quitman. At that time, "the foot was busted over there already, and around the ankle there where it was done cooked." The doctor dressed his foot and leg, bandaging the leg from the instep to the knee. That night he felt like his leg "was going to burn off." The next day a Dr. Thompson redressed the leg and foot, put medicine on it and bandaged it back up. Concerning the conditions at the time, plaintiff testified: " * * * as he was cutting the bandage, he had to get a pan and lay my leg in the pan and then he cut the bandage and taken the bandage off. Flesh, water and everything just run out in the pan. And then also he had to pull some of the flesh that was hanging before he could dress it for me * * * It looked like boiled meat or something. It was even smelling where it was burnt, you could smell it." Dr. Thompson dressed the wound again the next day and thereafter every day for two weeks or more. During the time plaintiff's right foot and ankle were stiff and numb and there was stiffness and tightness around the leg. It was treated with ointment and unguentine and other medicines. Dr. Thompson did not discharge him until January 1951, but at that time plaintiff's leg was still hurting. By July 21, 1951 the wound had healed and the doctor recommended settlement. Plaintiff got around on crutches for a month and a half and then with a walking stick for 5 or 6 weeks.

At the time of the trial (February 17, 1953), plaintiff testified that he was not able to perform the duties of a brakeman in local freight service; and that he had not worked because he was "not able to." As to the condition of his right foot, he said: "It is stiff in the ankle, and all them leaders pull. I can't use it like I should. * * * It feels pretty good when I first get up in the morning. * * * After I start around on it for an hour or so, then them leaders goes to pulling. * * * I go sit down when it gets to hurting." He had not been able to do more than sit around or "just walking around the home place," carrying in a little wood for his sister or helping her feed three cows "ever now and then." He had tried to work around the home and in the garden. He said: "I can't get out there and work * * * I am disabled. * * * I just can't hold out, I have got to give up."

Plaintiff's medical evidence tended to show that on June 23, 1952, he was complaining of soreness and aching of the right foot; that he could not trust himself on that foot; and that his shoe irritated the foot and leg and it became tender. His physician testified that on the posterior aspect of the right leg there were two areas of scar tissue measuring six and one-half by three inches. He said: "This scar tissue probably represents first and second degree burns which have healed with some scar tissue involvement * * *. There is some impairment of the active motion of the foot at the ankle; that is, the man himself when he moves the foot upward and downward and to the side * * * there was some impairment * * *. There is some numbness in the scar area * * * he complained of numbness in that area, which is normal because of the destruction of some of the sensory nerves; that is, the nerves of sensation do not go into the scar area * * *. And there is also some tenderness in certain portions of the area. * * * There was some sensation loss * * *." The conditions found could have been due to the application of a hot

liquid. As to the impairment of plaintiff's ability to work because of his injury, the witness said: "Well, I think it has been impaired, but whether it has been impaired sufficiently to prevent him from returning to work as a brakeman, as I said, I don't believe that I am in a position to state * * * I can't make a definite statement on the basis of the—of the injury alone. * * * There is some disability of his right foot and when you move it (the ankle) even passively there is some pulling on that scar tissue." The injury was a contributing factor to plaintiff's inability to return to his work as a brakeman.

Defendant's medical evidence favorable to plaintiff showed that, when first injured, plaintiff had been in some pain from first and second degree burns; that he had a second degree burn beginning at the ankle of the right foot and extending eleven inches up; that such injuries are painful and don't heal rapidly; that the wound was dressed seventeen times; that plaintiff might have a slight ankylosis; and that plaintiff had complained of pain in walking.

Since the injuries shown are of a permanent nature resulting in pain and suffering and loss of earnings, the evidence is sufficient to show plaintiff is reasonably certain to suffer loss of earnings and to endure pain and suffering in the future. These inferences could be drawn from the evidence presented. King v. Mo. Pac. R. Co., supra, 263 S.W. 828, 833; Dean v. Kansas City, St. L. & C. R. Co., supra, Canty v. Halpin, 294 Mo. 118, 242 S.W. 97, 102(6). Instruction No. 7 was supported by evidence.

Considering all of the foregoing favorable evidence as true and giving the plaintiff the benefit of all favorable inferences to be drawn therefrom, the evidence was sufficient to support the amount of the verdict. Plaintiff's own testimony tends to show that his ability to work has been totally destroyed and his medical evidence shows that his earning capacity has been impaired by reason of his injury. The evidence shows loss of earnings, permanent impairment of earning capacity and pain and suffering in the past and in the present and the inference as to future pain and suffering and loss of wages can be drawn from this evidence. On the record presented we do not find the award excessive or so excessive as to show passion and prejudice of the jury or such as to require any remittitur. The cases relied upon by appellant, to wit, Stanley v. Ray, Mo.App., 220 S.W.2d 75; Thompson v. St. Louis Public Service Co., Mo.App., 242 S.W.2d 299 and Larson v. Atchison, T. & S. F. R. Co., Mo. Sup., 261 S.W.2d 111, did not involve similar injuries.

The judgment is affirmed.

All concur.